E-filing

1    PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2    Name    **DICKERSON    LADELL**
         (Last)              (First)              (Initial)

3    Prisoner Number ___P-48453___

4    Institutional Address ___P.O. BOX 2461, 3A01-244___

5

6                    UNITED STATES DISTRICT COURT
7                    NORTHERN DISTRICT OF CALIFORNIA

8    **LADELL DICKERSON**                    CV 08    2347
      (Enter the full name of plaintiff in this action.)

9                                            Case No. _____
                    vs.                      (To be provided by the clerk of court)

10   **DARRAL ADAMS, Warden**
                                             PETITION FOR A WRIT
11   _____        OF HABEAS CORPUS

12   _____                    RMW

13   _____

14   _____                    (PR)
      (Enter the full name of respondent(s) or jailor in this action.)

15

16                    Read Comments Carefully Before Filling In

17   When and Where to File

18           You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23           If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS            - 1 -

1  Who to Name as Respondent

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10 A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11      1. What sentence are you challenging in this petition?

12      (a)   Name and location of court that imposed sentence (for example; Alameda

13            County Superior Court, Oakland):

14            ALAMEDA                              1225 Fallon St. Oak. Ca. 94621

15            Court                                Location

16      (b)   Case number, if known _____ A08737

17      (c)   Date and terms of sentence ___ MAY 24, 1999

18      (d)   Are you now in custody serving this term? (Custody means being in jail, on

19            parole or probation, etc.)   Yes _X_   No _____

20            Where? DEPARTMENT OF CORRECTIONS

21            Name of Institution: CORCORAN STATE PRISON

22            Address: 4001 KING AVE. CORCORAN, CALIFORNIA 93212

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  VOLUNTARY MANSLAUGHTER WITH USE OF FIREARM, PENAL CODE 192(a);

27  P.C. 12022.5.

28

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:             Yes _X_    No ____

    Preliminary Hearing:    Yes _X_    No ____

    Motion to Suppress:    Yes _X_    No ____

4. How did you plead?

    Guilty ____    Not Guilty _X_    Nolo Contendere ____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _X_    Judge alone____    Judge alone on a transcript ____

6. Did you testify at your trial?    Yes _X_    No ____

7. Did you have an attorney at the following proceedings?

    (a)    Arraignment    Yes _X_    No ____

    (b)    Preliminary hearing    Yes _X_    No ____

    (c)    Time of plea    Yes _X_    No ____

    (d)    Trial    Yes _X_    No ____

    (e)    Sentencing    Yes _X_    No ____

    (f)    Appeal    Yes _X_    No ____

    (g)    Other post-conviction proceeding    Yes _X_    No ____

8. Did you appeal your conviction?

    (a)    If you did, to what court(s) did you appeal?

    Court of Appeal    Yes _X_    No ____

    Year: _4/03/00_    Result: _JUDGMENT AFFIRMED_

    Supreme Court of California    Yes _X_    No ____

    Year: _6/14/00_    Result: _Petition for Review -Denied_

    Any other court    Yes ____    No ____

    Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                                 Yes _____      No __X__

   (c)   Was there an opinion?                      Yes _____      No__X__

   (d)   Did you seek permission to file a late appeal under Rule 31(a)?

                                                                Yes _____.      No_____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to
this conviction in any court, state or federal?                      Yes _____      No __X__

     [Note: If you previously filed a petition for a writ of habeas corpus in federal court that
challenged the same conviction you are challenging now and if that petition was denied or dismissed
with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit
for an order authorizing the district court to consider this petition. You may not file a second or
subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28
U.S.C. §§ 2244(b).]

   (a)   If you sought relief in any proceeding other than an appeal, answer the following

           questions for each proceeding. Attach extra paper if you need more space.

     I.    Name of Court: _____

          Type of Proceeding: _____

          Grounds raised (Be brief but specific):

          a._____

          b._____

          c._____

          d._____

          Result: _____ Date of Result:_____

     II.   Name of Court: _____

          Type of Proceeding: _____

          Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

III.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

IV.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No _X_

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1   need more space.  Answer the same questions for each claim.

2       [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One:___  APPRENDI CLAIM IS NOT UNTIMELY

6       _____

7       Supporting Facts:_____

8       _____

9       _____

10      _____

11      Claim Two:___  EXCESS OF JURISDICTION

12      _____

13      Supporting Facts:_____

14      _____

15      _____

16      _____

17      Claim Three:___  CUNNINGHAM IS DICTATED BY APPRENDI

18      _____

19      Claim Four:
        Supporting Facts:___  ERROR NOT HARMLESS

20      _____

21      Claim Five:___  EX POST FACTO AND DOUBLE JEOPARD BAR REMAND

22      _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25          NEWLY DISCOVERED
        _____

26      _____

27      _____

28      _____

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4                    UKN.

5

6

7    Do you have an attorney for this petition?            Yes_____    No_X_____

8    If you do, give the name and address of your attorney:

9                    N/A

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on __4/30/08__            _Ladell Dickerson_ - P.48453

14            Date                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

LADELL DICKERSON, P-48453
P.O. BOX 3461, 3A01-244U
CORCORAN, CALIFORNIA 93212-3461

Petitioner: In Pro Se

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LADELL DICKERSON, | Case No.:_____ |
|      Petitioner | |
|     V. | **PETITION FOR WRIT OF** |
| DARRAL G. ADAMS, Warden | **HABEAS CORPUS** |
| _____Respondent._____/ | |

### STATEMENT OF THE CASE
### Superior Court Review

Prior to the instant petition, a petition for Writ of Habeas Corpus raising this issue was filed with the Superior Court of the Alameda County, Case #131928, on March 01, 2007. It was denied on April 30, 2007. The five (5) page Order Denying Petition For Writ Of Habeas Corpus is submitted, separately bounded, as **Exhibit C.**

### FIRST APPELLATE COURT
### Court of Appeal Review

The same petition supplemented with discussion in response to the points the Superior Court raised, was timely filed with the Court of Appeal, First Appellate District in case #A117975. On June 06, 2007, the court requested Opposition to the petition from the Attorney General's Office. On June 29, the Attorney General filed it's Brief in Opposition, **(See Exhibit D).**

-8-

Petitioner therefore, on August 28, 2007, filed his Reply to Respondent's Opposition.

The Court of Appeal denied the petition without comment. **(See Exhibit E).**

///

///

///

//

1

2
<center>INTRODUCTION</center>

3

4     This petition raise issues regarding the reach of the holding

5 in <u>Cunningham v. California</u>, (2007) 549 U.S. ___.   Petitioner, a

6 state prisoner whose conviction had become final shortly AFTER

7 <u>Apprendi v. New Jersey</u>, (2000) 530 U.S. 466, was decided, contends

8 that Cunningham was a result ineluctably dictated by Apprendi and

9 therefore must be applied to the petitioner's case.

10

11              <center>PERTINENT FACTS</center>

12     In a murder prosecution in which petitioner disputed but one

13 element -- that he acted in self defense - petitioner was found

14 guilty of the lesser charge, that of voluntary manslaughter with

15 use of a firearm.   Petitioner was given upper terms for both.

16     In sentencing petitioner to the high term of 10 years for the

17 use of a firearm, the court first commented on its doubt toward

18 the petitioner's remorse, whether the remorse was toward what he had

19 done or toward himself.   The court then noted that there was no

20 disclosure as to the location of the weapon and that there was no

21 explanation as to why the petitioner was armed on the day of the

22 incident.   The court then remarked that the victim was unarmed and

23 concluded that the number of rounds fired showed an egregious use

24 of this firearm. (see sentencing transcript, EXHIBIT A, p. 17-19.)

25     The court also imposed the high term for the voluntary manslau-

26 ghter.   The court based that on petitioner's juvenile record; a

27 prior felony conviction; and that the petitioner was on probation.

28

Petitioner's conviction became final on September 12, 2000,
after Apprendi v. New Jersey was decided (June 26, 2000). (This
Court denied petitioner's direct appeal on June 14, 2000, in case
# S 088082.)


ARGUMENT I


In Cunningham v. California, (2007) 549 U.S.__ (Cunningham),
the Supreme Court of the United States held that California's
Determinate Sentencing Law violated the right to jury trial under
the Sixth Amendment and the Fourteenth Amendment because it permits
imposition of an upper term sentence, in excess of the statutory
maximum, based on facts not found by a jury, beyond a reasonable
doubt.

The genesis of this 6th Amendment jurisprudence begin with the
decision in Apprendi v. New Jersey, (2000) 530 U.S. 466, (Apprendi).
It held that "any fact that increases the penalty for a crime beyond
the prescribed statutory maximum must be submitted to a jury and
proved beyond a reasonable dout." id. 530 U.S. at 490.  This vision
was later refined in Blakely v. Washington, (2004) 542 U.S. 296,
(Blakely), and U.S. v. Booker, (2005) 543 U.S. 220, (Booker) where
the statutory maximum is defined as "the maximum sentence a judge
may impose after finding additional facts, but the maximum he may
impose without any additional findings.  When a judge inflicts
punishment that the jury's verdict alone does not allow...the judge
exceeds his proper authority." Blakely at p. 303.

In petitioner's case, the jury did not find and the petitioner

)URT PAPER
ATE OF CALIFORNIA
'O. 113 (REV. 8-72)

, 34769

1

2 did not admit to any of the aggravating factors used to elevate

3 petitioner's sentence.   Therefore, the trial court exceeded its

4 authority in sentencing petitioner beyond that of the statutory

5 maximum.

6

7 AN APPRENDI CLAIM RAISED NOW IS NOT UNTIMELY

8     At the time Apprendi was decided, petitioner's direct appeal

9 was in its final stage.   This Court had already issued its decision

10 denying review.   Had it not been the 90 days in which a certiorari

11 petition may be sought, his Apprendi claim would have been time

12 barred.(Caspari v. Bohlen, (1994) 510 U.S. 383.)   At that time the

13 appellate counsel had already disengaged himself from the petition-

14 er's case and petitioner himself was not sophisticated enough to

15 decipher the legal complexities of the Apprendi ruling and how it

16 might affect petitioner.   It was only until Cunningham, which

17 spelled out unequivacally how upper term sentences, imposed without

18 the factual basis being tried to the jury, violate the Sixth Amend-

19 ment, did the claim became known to the petitioner.

20     Moreover, a habeas petition raising Apprendi claim would have

21 been denied before the arrival of Cunningham.   Cunningham clarified

22 on what was until then an unrecognized interpretation of Apprendi

23 and Blakely, (People v. Black, (2005) 35 Cal.4th 1238, (Black I)).

24 Intervening change in law, as Cunningham certainly has done, marks

25 a new beginning, so to speak, for the purpose of a timeliness

26 inquiry. In Re Clark, (1993) 5 Cal.4th 750.

27

28

1

2  EXCESS OF JURISDICTION

3       An Apprendi violation, that an upper term sentence based on

4  facts not found by the jury is in violation of the 6th and 14th

5  Amendments, is essentially an argument that the sentencing court

6  acted in excess of jurisdiction when it sentenced the petitioner

7  beyond that which is permitted by law.  The validity of a sentence

8  may be challenged at any time.  In Re Estrada, (1965) 63 Cal.2d 740,

9  750.  "[T]he rule requiring a habeas corpus petitioner to justify

10 any substantial delay in raising a claim, however, is inapplicable

11 to a claim, as here, of sentencing error amounting to an excess of

12 jurisdiction.  An appellate court may 'correct a sentence that is

13 not authorized by law whenever the error comes to the attention of

14 the court.'"  In Re Harris, (1993) 5 Cal.4th 813, 842.

15      Setting as an example of what acting in excess of jurisdiction

16 is, the Harris Court referred to another In Re Harris, (1989)

17 49 Cal.3d 131.  The petitioner there argued that the term "brought

18 and tried separately" in the sentencing enhancement provisions for

19 priors means each of the qualifying prior must be distinctly

20 brought and tried.  Agreeing, this Court went on to say that

21 although the issue had already raised, unsuccessfully, on direct

22 appeal "[the petitioner]was entitled to renew the claim on habeas

23 corpus because a misinterpretation of the penal statute would

24 result in a longer sentence than was permitted by law, and imposit-

25 ion of the sentence was therefore in excess of the trial court's

26 jurisdiction."  In Re Harris, 5 Cal.4th at 839.  An Apprendi viola-

27 tion has similar effect.  As the sentence in the 1989 Harris case

28 was beyond the court's jurisdiction to impose, the upper term in

the petitioner's case was likewise a product of teh court acting in

excess of jurisdiction.  "Fundamental jurisdictional defects [i.e.,

acts in excess of jurisdiction], like constitutional defects, do

not become irremedial when a judgment of conviction becomes final,

even after affirmance on appeal."  In Re Harris, Bracket in original.

THE HOLDING IN CUNNINGHAM IS DICTATED BY APPRENDI

This is perhaps the most pertinent issue before this court:

whether Cunningham and Blakely are dictated by Apprendi.  Petitioner

contends that every essential holding in Blakely and Cunningham

traces its root to Apprendi.  Reading Apprendi fairly and objectively,

it is inevitable that the conclusions of Blakely and Cunningham be

reached.  This is evident from both comparing the decisions together

or analyze the Apprendi holding by itself.

In Cunningham, the Supreme Court reiterated that all of its

holding have always been based on Apprendi: "We have since reaffirm-

ed the rule of Apprendi, applying it to facts subjecting a defendant

to the death penalty, Ring v. Arizona [citation], facts permitting

a sentence in excess of the 'standard range' under Washinton's

sentencing Reform Act, Blakely [citation], and facts triggering a

sentence range elevation under the then-mandatory Federal Sentencing

Guidelines, Booker [citation]." Cunningham, at p. 864.  In Blakely,

after setting forth the facts in the case, the very first remark

was "this case requires us to apply the rule we expressed in

Apprendi..."  Indeed, the succeeding decisions did not come to add

new content, but to reinforce Apprendi's consistency.

The key concern of Apprendi was to make sure there is no

uncertainty about what was offensive to the right of trial by jury. "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." (Apprendi at p. 490) California's sentencing scheme which required a judge to find a qualifying fact before the upper term can be imposed, is precisely the kind of legislative act prohibited here. This principle cannot be limited by how the qualifying fact is labeled, or how it is packaged. There is no point to focuse on the differences of the enabling statutes from which the increased penalty is derived. Whether a term from among three terms within the same statute or an enhanced term from a different statute, "the relevant inquiry is one not of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Apprendi, at p.494.

This point is underscored when the state of Washington attempted to distinguish its statutory scheme from that of New Jersey's by pointing to the distinction between the two statutory regimes. In response the Supreme Court explained:

> "This distinction is immaterial. Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in Apprendi), one of several specified facts (as in Ring), or any aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact." (Parentheses in original.)

> "Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it

1

2          beyond the bare elements of the offense.  Whether the
           judicially determined facts require a sentence enhance-
3          ment (as in Apprendi) or merely allow it (as in this
           case), the verdict alone does not authorize the sentence."
4          Blakely, fn.8 (Parentheses added.)

5      The petitioner's claim is foundationally based on Apprendi.

6  Blakely and Cunningham, are but a clarification, a restatement, so

7  to speak, of Apprendi and came only to bring astrayed understandings

8  of Apprendi in line with its original holding.  The Supreme Court

9  acknowledged as much:

10         "Our  precedents make clear, however, that the 'statutory
           maximum' for Apprendi purposes is the maximum sentence
11         a judge may impose solely on the basis of the facts
           reflected in the jury verdict or admitted by the defen-
12         dant...  In other words, teh relevant 'statutory maximum'
           is not the maximum sentence a judge may impose after
13         finding additional facts, but the maximum he may impose
           without any additional findings."

14
           "This case requires us to apply the rule we expressed
15         in Apprendi v. New Jersey, (citation): 'Other than
           the fact of a prior conviction, any fact that increase
16         the penalty for a crime beyond the prescribed statutory
           maximum must be submitted to a jury, and proved beyond
17         a reasonable doubt."

18         "Our commitment to Apprendi in this context reflects
           not just respect for longstanding precedent, but the
19         need to give intelligible content to the right of
           jury trial."

20
           "Those who would reject Apprendi are resigned to one
21         of two alternatives..."

22     In Cunningham, the point is no less clear:

23         "To summarize: Contrary to the Black court's holding,
           our decisions from Apprendi to Booker point to the
24         middle term specified in California's statutes, not
           the upper term, as the relevant statutory maximum.
25         Because the DSL authorizes the judge, not the jury,
           to find the facts permitting an upper term sentence,
26         the system cannot withstand measurement against our
           Sixth Amendment precedent."  Cunningham, at 871.

27
           "Because circumstances in aggravation are found by
28

1

2         the judge, not the jury, and need only be established
        by a prepondence of evidence, not beyond a reasonalbe

3         doubt... the DSL violates Apprendi's bright-line rule..."
        at p. 868.

4

5     Because Apprendi controls and dictated the holding of Cunningham,

6 the petitioner must be afforded the protection described therein.

7

8 ERROR NOT HARMLESS

9     Two upper terms were imposed in the petitioner's case.  One

10 based in part on petitioner's prior felony conviction and his status

11 as a probationer.  The second upper term was based entirely on his

12 conduct relating to the commission of the offense.  Petitioner is

13 of the view that both terms are impermissible but will focus his

14 argument on the latter.

15     In this case, harm must be presumed because the petitioner had

16 not an opportunity to defend against the allegations that supported

17 the upper term.

18     In addition, even assuming the error is subject to harmless

19 error analysis, it cannot be shown to be harmless beyond a reasonable

20 doubt.  Two key indicators inform the application of this analysis:

21 (1) by finding petitioner not guilty of murder where the only dispu-

22 ted issue was motive, the jury implicitly accepted that the petition-

23 er had acted in self defense, and (2) the Probation Officer's report

24 which was submitted after an in depth interview with the petitioner,

25 was extremely favorable. (The Report is submitted as EXHIBIT B).

26 It noted the following mitigating factors:

27         1. The victim was a provoker of the incident, was known
        to be violent, and had made threats against the petitioner

28         to others, who let the petitioner know about the threats;

DURT PAPER
ATE OF CALIFORNIA
'D. 113 (REV. 8-72)

; 34769

2. the petitioner committed the offense under duress, in that he knew the victim had made threats against him, and he knew that the victim had a reputation as being violent and capable of anything, and when petitioner saw the victim reach inside his pants the petitioner thought he was reaching for a gun;

3. the petitioner had no prior record or an insignificant record of criminal conduct, considering the recency and frequency of prior crimes.

EXHIBIT B, Probation Officer's Report, p.6.

The Probation Officer also delved into the petitioner's past and evlauated his credibility.  The Probation Officer noted that the petitioner "did not deny the offense during the interview and seemed sincere in discussing his remorse." (p.6)  Moreover, while petitioner suffered some juvenile adjudications and one adult drug-related conviction, "[t]his does not show a continued history of violence, and it is not clear that this offense is an indication of his being a danger to society." (p.7)  Petitioner periodically worked through a temporary employment agency, "which shows some initiative."  The Report noted that though petitioner "did leave the state after the shooting, [w]ithin three months, he contacted a bailbondsman to arrange for his self-surrender and spoke to an officer in the Oakland Homicide Division about this.  When he spoke to officers about the offense, he did not deny his culpability." (p.7)  Consequently, the probation report recommended the mid terms totaling 10 years. (p.7)

Not known for being imprudent nor gullible, the probation officer's opinion could easily have been adopted by the jury.

EX POST FACTO AND DOUBLE JEOPARD BAR REMAND

No aggravating facts were pled, tried to a jury, or subjected to the burden of proof beyond a reasonable doubt.

Under Cunningham, a defendant has a Fifth, Sixth, and Fourteenth Amendment right to notice of the charges, jury trial, and proof beyond a reasonable doubt not only for the charged substantive offenses but also for any aggravating facts that might be relied upon to support an upper term.

Law that is enacted after the offense was commited may not be applied to the petitioner and that should apply to statute enacted by the legislature or by the courts if the court is acting in the capacity of a lawmaker.

The discharge of the jury without a trial, let alone a verdict, on the questions of aggravating facts supporting the upper terms terminated jeopardy on that issue in the same way that an acquittal would have.

PRAYER OF RELIEF

WHEREFORE, PETITIONER PRAYS THAT A WRIT OF HABEAS CORPUS be issued directing  the reduction of the petitioenr's sentence to 10 years.  Or in the alternative, that the respondent show cause, if any why the relief sought should not be granted; and for such other and further relief as the court may deem just and equitable.

DATE: 4/30 ,2008.

LADELL DICKERSON
PETITIONER: In Pro Se

Ladell Dickerson
P-40453

URT PAPER
TE OF CALIFORNIA
D. 113 (REV. 8-72)
34769

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LADELL DICKERSON

v.

DARRAL G. ADAMS, Warden

Case Number: _____

PROOF OF SERVICE

_____ /

I hereby certify that on _____ APRIL **30**th _____, 2008 ____. I served a copy

of the attached PETITION FOR A WRIT OF HABEAS CORPUS WITH EXHIBITS

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by

depositing said envelope in the United States Mail at CORCORAN STATE PRISON

```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CALIFORNIA 94102-3483
```

I declare under penalty of perjury that the foregoing is true and correct.

_Ladell Dickerson_

(Name of Person Completing Service)

1
2  Ladell Dickerson, P-48453
3  CSP, CORCORAN, 3A01-249
4  P.O. BOX 3461
5  CORCORAN, CA 93212
6
7  IN PRO SE
8
9
10
11  In Re Ladell Dickerson,          )    CASE No.
                                      )
12      On Habeas Corpus.            )    EXHIBITS IN SUPPORT OF PETITION
                                      )    FOR WRIT OF HABEAS CORPUS
13
14
        EXHIBIT A: The sentencing transcript
15
        EXHIBIT B: The Probation Officer's Report
16
        EXHIBIT C: The Superior Court ORDER DENYING PETITION FOR
17              WRIT OF HABEAS CORPUS (opinion)
18      EXHIBIT D: Brief in OPPOSITION by the Attorney General.
19      EXHIBIT E: Petitioner's REPLY TO RESPONDENT'S OPPOSITION.
20      EXHIBIT F: ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
                by the Court of Appeal.
21      EXHIBIT G: ORDER DENYING PETITION FOR WRIT of HABEAS CORPUS.
        by the Supreme Court of CALIFORNIA.
22                          Respectfully submitted,
23
24
25
26  DATE:
27
28

# EXHIBIT

# A

C00393

1  could be wrong on this, but it was my recollection that if

2  there was a verdict, regardless of what it was on the

3  homicide case, that the 11350 would be dismissed.

4      And I'm assuming -- you know, I assumed at the time

5  Mr. Jackson, although visibly not pleased with the finding of

6  the jury, made that motion to dismiss on that basis. And I

7  could be dead wrong on that. And I don't know if the

8  transcript will be very helpful, but that was my

9  recollection: If there was a conviction on the homicide

10  case, the 11350 would not proceed.

11      But be that as it may, just in terms of the legal

12  aspect of it, it doesn't appear to talk about when the

13  incident may be charged. In 12022.1(b) it talks about a

14  person arrested for a secondary offense, which the homicide

15  was, which was alleged to have been committed while a person

16  was released from custody on a primary offense shall be

17  subject to a penalty enhancement of an additional two years,

18  which shall be served consecutive to any other term.

19      It doesn't say whether the conviction has to take

20  place. I'm sure this is an extremely unusual situation, the

21  way it happened here, and hopefully the best judgment of

22  counsel in all respects will see the matter through.

23      Anything else?

24      MR. JACKSON:  Nothing from the People, Your Honor.

25      MS. STANLEY:  Submitted, Your Honor.

26      THE COURT:  All right.  The formal arraignment having

27  been waived; the defendant having been convicted by a jury of

28  the offense of a felony, to wit, a violation of Section

C00394

1   192(A) of the Penal Code, a lesser offense to that charge in

2   the fourth, it's the judgment of the Court and it is hereby

3   ordered, adjudged, and decreed that in punishment for said

4   offense, the defendant be imprisoned in the State Prison in

5   the State of California for a period of 11 years.

6        The Court fixes the aggravated term based on several

7   factors.  Included among those are the fact that the

8   defendant had a juvenile record that involved commitments and

9   runaways showing that he was -- had some difficulties as a

10  juvenile; the fact that he had a prior felony conviction

11  under 11351.5; and, in fact, he was on probation at the time

12  that the incident itself occurred.

13       In terms of circumstances in aggravation by the   Rule 42a(a)

14  probation officer, 421(a)(1) indicates that the offense

15  involved great bodily harm and that the victim died.  That

16  really is not an aggravating factor since it's part of the

17  makeup of the offense and the Court doesn't find that to be

18  true.  Under (a)(2), the defendant was in fact armed with and

19  used a weapon during the course and commission of this crime,

20  to wit, a semiautomatic handgun.

21       And they note under (b)(4) that he was on probation

22  in San Francisco when the crime was committed.  And as I

23  indicate, the prior performance on probation was

24  unsatisfactory, apparently, both as an adult and as a

25  juvenile.

26       Looking at circumstances under mitigation, just to

27  give you my view on that, the probation officer as I've

28  indicated under (b)(1) -- that's just not true.  Under (a)(2)

C00035

1  and (a)(4), the Court has considered those items.  And

2  although there is some element, given the jury's finding,

3  that elements of that are there or some weight of that is

4  probably true, it's not as clear-cut as the probation officer

5  makes it stand.  So for those reasons, he's given the

6  aggravated term of 11 years.

7       In addition to that, the Court has to consider the

8  penalty under 12022.5, the use clause.  And I believe in the

9  date that this occurred, that the penalty at this point had

10  risen to three, four, or ten years.

11       In looking at the Rules of Court, specifically

12  428(b), it suggests or directed that the Court select the

13  midterm unless there are factors in either aggravation or

14  mitigation of that.  And it points out that only

15  circumstances in aggravation that relate directly to the fact

16  giving rise to the enhancement should be considered.  In

17  other words, not general social factors.

18       In looking at that, the Court considers when you

19  speak of remorse -- I know that there's some expressed.  At

20  this point I'm never quite sure if that's remorse for

21  yourself or remorse for what you've done.

22       I was concerned in this case that there was no

23  disclosure as to the location of the weapon.  I don't know

24  where that weapon is, but hopefully it is not in such a place

25  that it will come to harm or be used in some other violent

26  offense:  discovered by some youngster who will use it in

27  another act of violence against another person or maybe even

28  tragically against themselves.

C00396

```
1        In this particular case and in concerning the facts
2   of how this weapon was used, it appears to me it never was
3   explained to me why Mr. Dickerson had the weapon with him at
4   that particular time on that particular day standing at that
5   particular location.  That was -- that's not been made clear
6   to the Court.  It's obvious that Mr. Aubrey did not have a
7   firearm.
8        If I were to believe as the jury believes, and I
9   accept their findings, that Mr. Dickerson did have in his own
10  mind, a fear of Mr. Aubrey, had reason for concern at least
11  in his mind that Mr. Aubrey intended to do him harm at some
12  point, and was concerned, the question in my mind is, one,
13  did he act too quickly and, two, did he overreact?
14       And as to the first, the Court makes no finding one
15  way or the other.  I realize what goes on in the street
16  sometimes requires not a whole lot of thought.  Perhaps with
17  weapons and the multi-round capacity we have and the
18  rapid-fire weapons we have, make it a different world than it
19  was when I was his age, which was quite sometime ago.
20       Nonetheless, it seems to me that even though -- even
21  though that is true, if he does have an honest fear about it
22  for himself, once he pulls that firearm and fires a round
23  into Mr. Aubrey's body, Mr. Aubrey is -- now he has yet to
24  see a weapon.  Mr. Aubrey is obviously disabled.
25       I know it's been told to me -- and I don't know if
26  the testimony indicates this.  I believe it came through as
27  the part of his statement -- that he doesn't go down, but
28  obviously he had been gravely wounded and was not in a
```

C00397

1   position to be doing any kind of return fire.

2          At this point, Mr. Dickerson was armed with an

3   extremely powerful weapon, knew how to use it, and had it

4   right there should any additional danger present itself.

5          But it appears to the Court that the additional

6   firing of the number of rounds into the back and the head of

7   Mr. Aubrey, as the evidence clearly showed, showed an

8   egregious use of this particular firearm.

9          The code section itself, 120 -- strike that.

10          In the definition of a use of a firearm which was

11  presented in 120306, use of a weapon is talked about in

12  merely displaying a weapon in a menacing manner, intently

13  firing it, striking it, or hitting someone with it.

14          Someone firing here -- even if it had been a fatal

15  shot may be a lessor point -- but firing additional shots

16  warrants the aggravated term in use of the firearm.  And the

17  Court will assign the aggravated term on those reasons for an

18  additional ten years:  11 years for the voluntary

19  manslaughter; ten years for the use of the firearm.

20          The Court will impose, as it's required to by law,

21  and suspend an additional two years under 12022.1.  The law

22  indicates that the imposition of this enhancement shall be

23  stayed pending imposition of the sentence for the primary

24  offense, this being the secondary offense.  The stay will be

25  lifted by the Court here.

26          In the primary offense, the time in the sentencing

27  for that offense shall be recorded in the abstract of

28  judgment.  If the person shall be acquitted or the case in

C00398

1  some other way be dismissed of the primary offense, this stay

2  shall become permanent, and that is an additional two years.

3  So what we've got here is a total of 23 years.

4         In terms of credit for time served against that term,

5  the Court believes this is an offense that fits under the

6  credit for time served award as set forth in 2933.1.  By my

7  calculation, he has 746 actual days of credit.  In addition

8  to that, he's entitled to 112 days of conduct credit which is

9  the 15 percent rate for a total of 858 days.

10        The Court will assign a restitution fine of $4,800

11 pursuant to section 1202.4 of the Penal Code.  The Court will

12 reserve any  -- reserve the right to impose some restitution

13 order under 1202.4(f).  At this point, the defendant is

14 remanded to the Sheriff of Alameda County for delivery to the

15 Department of Corrections pursuant to this order.

16        Mr. Dickerson, I'm going to tell you something about

17 your appellate rights.  Obviously, you have a right to

18 appeal.  That notice of appeal by you has to be filed within

19 60 days, and it should be filed in this Court, that is, the

20 Superior Court of Alameda County rather than with the Court

21 of Appeal.  And your notice of appeal should clearly indicate

22 that you are appealing and what you're appealing from -- if

23 it's just a part of judgment or the whole case.

24        Do you understand those rights?

25        THE DEFENDANT:  Yes, I do.

26        THE COURT:  All right.  He is remanded for delivery

27 to the Sheriff of Alameda County for delivery to the

28 Department of Corrections pursuant to this order.

CC0399

1    THE DEFENDANT:  One question for you.

2    THE COURT:  Sure.

3    THE DEFENDANT:  I want to spend a minute with my

4 mother.  I want to hug my mother before I'm remanded.

5    THE COURT:  I'm going to leave that up to the

6 bailiff.  I suggest any visitation is probably going to have

7 to take place either in Santa Rita or North County where

8 you're kept, but I'm not going to order it in the courtroom.

9 I'll have Charley Plummer over here all over my case.

10    THE BAILIFF:  (Shakes head.)

11    THE COURT:  Anybody have anything else for the

12 record?

13    MR. JACKSON:  No, Your Honor.

14    MS. STANLEY:  No, Your Honor.  Thank you.

15    THE COURT:  One thing I forgot to impose was a parole

16 restitution fine.

17    The Court will also impose a parole restitution fine

18 of $4,800 under 1202.45, but that, too, will be suspended

19 pending his successful completion of parole.

20    Thank you.

21    (Proceedings concluded.)

22                        ---o0o---

23

24

25

26

27

28

# EXHIBIT

# B

Received: 5/12/99; 5:18PM; 6102887923 -> Document 1-2     Filed 05/06/2008     Page 10 of 70
MAY-12-99 WED 05:20 PM   ALA CO PROB OAKLAND        FAX NO. 5102887923          P. 03

Case 5:08-cv-02347-RMW    Document 1-2    Filed 05/06/2008    Page 10 of 70







**CONFIDENTIAL**

## SUPERIOR COURT OF CALIFORNIA
### COUNTY OF ALAMEDA, STATE OF CALIFORNIA

| THE PEOPLE OF THE STATE OF CALIFORNIA | Note: DDA Letter missing |
|---|---|
| VS | |
| DICKERSON, LADELL | Tanly |
| DEFENDANT | 5/13/99 |

## PROBATION OFFICER'S REPORT AND RECOMMENDATION

EVENT NAME  **DICKERSON, LADELL**
C.I.I. NAME **DICKERSON, LADELL NMN**               JUDGE   **KINGSBURY**

ADDRESS _3301 - 61st Ave., #2, Oakland, CA, 94605_     DEPARTMENT NO.  **12**

D.O.B  **04/15/74**          (AGE:  **24**  )        DOCKET NO.    **131928**

SEX   **MALE**          ETHNIC **BLACK**      REFERRAL DATE   **04/01/99**
  HT. **6FT   1IN** WT.  **225**     HAIR   **BLACK**
C.I.I. NO.  **09352392**                    COURT DATE      **05/17/99**

CEN.   **7128028**                    DEFENSE ATTORNEY   **TRINA THOMPSON**

PFN.  **AVQ848**                   REPORT BY ____ **DIANE S. TALSKY**
                                         DEPUTY PROBATION OFFICER

CHARGES FILED   **PC 187 U&G&BA F; PC 192(A) USE F**

CURRENT CHARGES   **PC 192(A) USE F**

CHARGE STATUS   **JURY VERDICT**

DATE AND PLACE OF    **ARREST**            ARREST AGENCY **OAKLAND PD**

  **05/09/97 WEBER CO JAIL          OA**

CURRENT CUSTODY STATUS   **IN CUSTODY**      DAYS IN JAIL THIS CHARGE __739__

CUSTODY STATUS THIS CHARGE **IN CUSTODY**
                         O.R. ON         BAILED ON      AMOUNT $

MARRIED:  Yes ____  No _X_  LIVES WITH  MOTHER    INCOME SOURCE  UNEMPLOYED

FORM 240-58 (REV 9-78)

DICKERSON, Ladell                                    Docket 131928

## CRIMINAL HISTORY

Juvenile:

| Date | Offense and Disposition |
|---|---|
| 4-9-90<br>Oakland | Offense: VC 20002(A).<br><br>Disposition: 6-25-90, formal supervision own home. |
| 9-8-90<br>Oakland | Offense: VC 12500(A); PC 148.9; WI 777/778.<br><br>Disposition: 1-18-91, Camp Sweeney. |
| 1-31-91<br>Oakland | Offense: PC 148.9; WI 777/778.<br><br>Disposition: 1-18-91, Camp Sweeney. |
| 3-16-91<br>ACSO | Offense: WI 777/778.<br><br>Disposition: 4-24-91, placement, Boys' Republic (Chino, CA.).<br><br>10-19-92, dismissed. |

Adult:

| Date | Offense and Disposition |
|---|---|
| 1-16-94<br>Oakland | Offense: VC 12500 M.<br><br>Disposition: 1-14-94, 18 months court probation, 25 days jail, 15 days suspended.<br><br>1-20-95, probation terminated. |
| 4-11-95<br>Oakland | Offense: VC 12500(A) M.<br><br>Disposition: 4-11-95, 18 months court probation, $1045 fine. |
| 5-7-95<br>San Francisco | Offense: HS 11351.5 F.<br><br>Disposition: 7-18-95, three years formal probation, 94 days jail.<br><br>5-6-98, revocation, bench warrant issued. |

Pending Criminal Cases: The defendant has an outstanding no-bail warrant issued on May 6, 1998, from San Francisco Superior Court for probation revocation. Warrant number 5510668. According to CORPUS, the warrant has not been served to date and there is no hold placed.

-2-

DICKERSON, Ladell                                    Docket 131928

The Deputy District Attorney refiled charges which had previously been dismissed. The previously dismissed docket was Superior Court docket 131927. This was resulting from an arrest by Oakland Police Department on October 1, 1996 for Health and Safety Code 11350(A), felony. The defendant had been granted diversion per Penal Code 1000 for the alleged Health and Safety Code 11350(A) matter, on October 8, 1996. Diversion was terminated for trial on February 25, 1997. (OMC docket 415028 CEN 6185163). Probation records show he completed the drug classes and tested negative from October 16, 1996 to January 22, 1997. The present offense occurred on February 2, 1997. He also refiled a charge of Penal Code 12022.1, felony. This matter has been continued to May 25, 1999, in Oakland Municipal Court, Department 03, at 9:00 AM, to set.

<u>Prior Probation History</u>: The defendant was granted felony probation in San Francisco Superior Court on July 18, 1995. He has an outstanding warrant for probation violation which was issued on May 6, 1998.

<u>Institutional and Parole History</u>:  None.

<div align="center">PRESENT OFFENSE</div>

<u>Offense Summary</u>: On February 2, 1997 at about 1:47 PM, the responding officer was on a call when he heard approximately six to seven gunshots one block south of his location. About three minutes later, the call came from dispatch, advising that a man was down in a pool of blood on Seminary. The officer responded and found the victim, James Aubrey, face down with bullet wounds to his head and back. The victim was dead.

Officers then convassed the area for witnesses. The defendant had left the scene and went to Utah where he obtained employment, using his correct name and social security number.

According to the defense attorney, a week before his arrest, the defendant called a bail bondsman in Oakland and tried to arrange a self-surrender with Oakland Police Department. He spoke to a Sergeant in Homicide Division and was given instructions to self-surrender to the nearest police agency in Utah. The defendant wanted to return to Oakland to self-surrender; however, he was arrested in Utah before he returned to Oakland and waived extradition when Oakland Police arrived in Ogden, Utah.

<u>Negotiated Plea</u>: There is no negotiated disposition as the defendant was convicted by a jury of violation of Penal Code 192(A) with use.

<u>District Attorney's Statement</u>:  See attached. _ if is not (

<u>Defense Attorney's Statement</u>:  See attached.

<div align="center">-3-</div>

DICKERSON, Ladell                                          Docket 131928

**Defendant's Statement Regarding Offense**:  The defendant stated that
he shot the victim because the defendant felt his life was in
danger.  The victim's attitude and reputation was that he "wasn't
someone to mess around with".  The defendant thought the victim was
armed.  He had been told that the victim was "out to kill him".
When the victim approached the defendant, the defendant felt his
life was in danger.  Because of the threats, the defendant was
carrying a gun.

The problem between the two began in October, 1996, when the
defendant was a passenger in the victim's car.  The police pulled
them over.  The victim tried to evade arrest.  He had a firearm and
"tossed it".  The police arrested the victim, and let the defendant
go.  When the victim got out of jail, he told people that he
expected the defendant to pay the money it cost to bail, or he would
"do something" to the defendant.  The defendant knew that the victim
was capable of murder and that's what the threat meant.

The defendant stated that he isn't "proud (nor) does he feel good"
about killing someone.  At the time of the shooting, his mother and
stepfather were incarcerated, and he was responsible for the care of
his younger siblings.  He was also going through a custody battle.
He had a lot of responsibility, and knew if he was killed, his
siblings wouldn't have anyone to care for them.

**Defendant's Statement Regarding Probation**:  The defendant stated
that he knows he will be incarcerated.  He wants to complete his GED
or get his high school diploma.  He hopes to get into a job training
program, such as electronics, so he will be able to get a job when
he is paroled.  His children are his main responsibility and wants
to be able to provide support for them when he is paroled.

**Victim's Notification and Statement**:  The police report and the
Deputy District Attorney's letter does not provide information for
the family of the victim.  The notification form was sent to the
Deputy District Attorney to send to the responsible people.  He
confirmed that he did mail the notification.

**Restitution, Fines and Fees**:  The restitution claim form was sent to
the Deputy District Attorney in the same envelope as notification
(see above explanation).

Standard fees and fines are recommended.

**Time in Custody**:  The defendant was arrested on May 9, 1997 and
remains in custody to this court date of May 17, 1999, for a total
of 739 days in jail.

## SOCIAL FACTORS

**Family Background**:  The defendant was born on April 15, 1974, in San
Leandro, California, to Ladell, Sr. and Terry (nee Nelson)
Dickerson.  He is the only child born to this couple.  His parents
divorced before the defendant was five years old.  His father was in

-4-

DICKERSON, Ladell                                              Docket 131928

and out of prison and the defendant saw him briefly on "rare
occasions". In 1986, when the defendant was 14, his father was
sentenced to a life term, and is currently at Folsom State Prison,
as far as the defendant knows. His father is an addict. He used
cocaine and methamphetamine.

When the defendant was 11 years old, his mother married Milton
Lovett. Their marriage remains intact. They had three children.
The defendant stated that he was an only child until age 14, when
his first half-sister was born. His stepfather is also an addict
and, at the time of the interview, he was in jail. The defendant
stated his stepfather sold drugs. In 1997, the defendant's mother
was in jail for forgery. She is now out of jail and is employed at
K-Mart as a supervisor.

The defendant gave his mother's address of 3301 - 61st Avenue #2,
Oakland, Cailifornia 94605 as the probable address when he is
released.

Marital History: The defendant married Tahonna Jackson in 1995.
Their divorce was final in October, 1998. They have a four-year-old
son. He also has a daughter who will be five in July, from another
relationship.

Educational History: The defendant stated that he attended East
Side Continuation School in Oakland to the 11th grade. Although his
attorney's letter stated he had his GED, the defendant stated for
this report, that he does not.

Employment History: The defendant had been doing warehouse work
through California Temporary Agency. He worked on and off for the
agency since 1993. He had also done security work for Lion
Security. While in Ogden, Utah, he worked at Iomega, building hard
drives.

Financial Status: The defendant has no income or assets.

Military History: None.

Medical History and Mental Health History: The defendant stated
that he is in good physical and mental health.

Alcohol and Drug History: The defendant stated that he does not
drink alcoholic beverages to excess. He started smoking marijuana
at age 16 (1990) and stated he last smoked it in late 1996. He
began using powder cocaine at age 22, and last used it shortly
after. He stated he used powder cocaine after the shooting in
February 1997, and only used it for one or two months. He was
arrested in May 1997. In reviewing the probation file, the
defendant was on drug diversion per Penal Code 1000 from October 8,
1996 to February 25, 1997, and was tested 13 of the 14 weeks. All
the tests were negative, including the drug test on January 22,
1997, which was nine days prior to the present offense.

DICKERSON, Ladell                                    Docket 131928

## SENTENCING FACTORS

### Rule 413:  Probation Eligibility When Probation is Limited

(b)          The defendant appears to be statutorily ineligible for
             probation absent unusual circumstances because of the
             provisions of 1203.06(A)(1) of the Penal Code. *- NO, mansl. not a 1373rd offense*

### Rule 414:  Criteria Affecting Probation

Not applicable.

### Rule 421:  Circumstances in Aggravation:

(a) (1)     The offense involved great bodily harm in that the victim
            died.

(a) (2)     The defendant was armed with and used a weapon at the time
            of the commission of the crime.

(b) (4)     The defendant was on probation in San Francisco when the
            crime was committed.

(b) (5)     The defendant's prior performance on probation and/or parole
            was unsatisfactory.

### Rule 423:  Circumstances in Mitigation:        *per*

(a) (2)     The victim was a provoker of the incident.  The victim was
            known to be violent by the defendant, and had made threats
            against the defendant to others, who let the defendant know
            about the threats.

(a) (4)     The defendant committed the offense under duress in that he
            knew the victim had made threats against the defendant, and
            the defendant knew that the victim had a reputation as being
            violent and capable of anything.  The defendant had a gun
            for his protection, and when he saw the victim reach inside
            his pants, the defendant thought he was reaching for a gun.

(b) (1)     The defendant has no prior record or an insignificant record
            of criminal conduct, considering the recency and frequency
            of prior crimes.  *1135/.5 probation*

## EVALUATION

The defendant is presently 25 years old, however, the offense occurred
when he was 22 years of age.  He did not deny the offense during the
probation interview, and seemed sincere in discussing his remorse.  He
also seemed fairly accurate in his drug history, as weekly drug test
results for three months prior to this offense concur with the
defendant's information that he stopped using drugs during that time
period.

-6-

DICKERSON, Ladell                                    Docket 131928

In reviewing the defendant's prior adjudications or convictions, none
are for violent offenses.  The adjudications resulted in placement in
Camp Sweeney, which is a residential program run by the Alameda County
Probation Department.  He ran from there twice and was finally placed
at Boys' Republic in Chino.  His adult conviction history shows only
one felony for possession of drugs for sales in San Francisco.  This
does not show a continued history of violence, and it is not clear that
this offense is an indication of his being a danger to society.
According to the information from the defendant and the defense
attorney, the defendant feared for his own safety as the victim had
made threats against his life.  This factor does not seem to indicate
that the defendant is a danger to society.

The defendant's parents and stepfather provided little example of how
to live a law-abiding life.  He grew up with drugs being used and sold
by his stepfather.  The defendant had worked through a temporary agency
(on and off) since age 18 or 19, which shows some initiative.

The defendant did leave the state after the shooting.  Within three
months, he contacted a bail bondsman to arrange for his self-surrender
and spoke to an officer in the Oakland Homocide Division about this.
When he spoke to officers about the offense, he did not deny his
culpability.

When reviewing the information from both attorneys, and the defendant's
information given during the probation interview, it is recommended
that the sentence be the mid-term for both violations, six years for
Penal Code 192(A) and four years for Penal Code 12022.1(A).  It is
hoped that the defendant does use the time to better himself so he does
satisfy his goal of providing support for his children, and become a
productive member of society.

<u>RECOMMENDATION</u>

It is respectfully recommended that probation be denied and that a
restitution fine in the amount of $600.00 be imposed pursuant to
Section 1202.4 of the Penal Code and that an additional restitution
fine be imposed pursuant to Section 1202.45 of the Penal Code in the
same amount, and that fine be suspended unless parole is revoked.

Date typed:   5-12-99                Respectfully submitted,
bjm/9082s
                                     SYLVIA J. JOHNSON
Approved by:                         CHIEF PROBATION OFFICER

_Jacqueline Keel_                    By: _Diane S. Talsky_
Jacqueline Keeles                        Diane S. Talsky
Supervisor, Investigation Unit           Deputy Probation Officer

I have read and considered
the foregoing report.
_____
JUDGE / SUPERIOR COURT                        -7-

# EXHIBIT C

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**          Dept. No. 9

Date: **April 30, 2007**          Hon. LARRY J. GOODMAN, Judge          Fil Cruz, Dep.Clk.
                                                                        Not Reported, Reporter

---

IN RE:
**LADELL DICKERSON**                          Counsel appearing          No Appearance, Deputy
                                              for Plaintiff              District Attorney

                    Petitioner

vs.                                           Counsel appearing          No Appearance
                                              for Defendant
**PEOPLE OF THE STATE OF CALIFORNIA**

                    Respondent

---

Nature of Proceedings: **EX PARTE HEARING**                    Case No. **131928**
                        **WRIT OF HABEAS CORPUS**               PFN: **AVQ848**
                                                                CEN:  **7128028**


This Court having reviewed the Petition for Writ of Habeas Corpus ("Petition") filed on March 1, 2007 by Petitioner
LADELL DICKERSON ("Petitioner"), **NOW HEREBY ORDERS:**

The Petition is denied.

Please find enclosed endorsed copy of Judge Goodman's Order Denying Petition for Writ of Habeas Corpus signed
and filed April 30, 2007.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause.
I served **ORDER OF THE COURT** by placing copies in envelopes addressed as shown below and then by sealing
and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below,
in the United States mail at Alameda County, California, following standard court practices.


Ladell Dickerson
CDC or ID Number  P-48453
3A01-249
CSP, Corcoran
P.O. Box 3461
Corcoran, CA 93212

Dated: April 30, 2007

By: _____
        Fil R. Cruz, Deputy Clerk

ENCLOSED: As Stated Above


Boilerplate - WRITS (Minute Order) (Rev. 6/1/06)

ENDORSED
SUPERIOR COURT OF THE STATE OF CALIFORNIA FILED
ALAMEDA COUNTY

COUNTY OF ALAMEDA                APR 3 0 2007

CLERK OF THE SUPERIOR COURT
By _____ FIL R. CRUZ _____
Deputy

| | |
|---|---|
| **In re** | **131928** |
| **LADELL DICKERSON** | **ORDER DENYING PETITION** |
| on Habeas Corpus. | **FOR WRIT OF HABEAS CORPUS** |

This Court having reviewed the Petition for Writ of Habeas Corpus ("Petition") filed on March 1, 2007 by Petitioner LADELL DICKERSON ("Petitioner"), **NOW HEREBY ORDERS:**

The Petition is denied.

Relying on *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), and *Cunningham v. California* (Jan. 22, 2007, No. 05-6551) 549 US. _____ , 2007 WL 135687 (*Cunningham*), Petitioner contends that imposition of the upper terms for his voluntary manslaughter conviction and personal firearm use enhancement violated his Sixth and Fourteenth Amendment rights. After trial, the jury convicted Petitioner of voluntary manslaughter as a lesser charge of murder, and found true the firearm use enhancement allegation. On May 24, 1999, the trial judge sentenced Petitioner to 21 years in prison. The judge reached this sentence by imposing the aggravated term of 11 years on the charge, and imposing the aggravated term of 10 years on the enhancement.

1

Whether Petitioner is entitled to attack his sentence depends, in part, on whether Petitioner's conviction and sentence were final as of the time the decisions he relies on became final. State convictions are final "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." (*Caspari v. Bohlen* (1994) 510 U.S. 383, 390, see also *Clay v. United States* (2003) 537 U.S. 522, 527.)    In an unpublished opinion filed in April 3, 2000, the Court of Appeal, First Appellate District, affirmed Petitioner's conviction. (See *People v. Dickerson,* A087362, Unpublished Opinion). The California Supreme Court denied Petitioner petition for review on June 14, 2000 (see S088082) and the remittitur issued on the case on June 27, 2000.  It does not appear that Petitioner filed a petition for a writ of certiorari with the Supreme Court. Petitioner's conviction and sentence therefore became final 90 days later.  (See 28 U.S.C. § 2101(d); Supreme Court Rules, rule 13.)

*Apprendi* was decided on June 26, 2000.  Petitioner's conviction was not yet final as of the *Apprendi* decision, therefore, the *Apprendi* rule would appear to be available to him.  According to the Petition, after Petitioner exhausted his appeals in state court, he filed a petition for a writ of habeas corpus in the United States District Court, Northern District, but he does not state the date of that filing.   One of the grounds he raised was that the sentencing court abused its discretion in imposing the upper term.  According to Petitioner the federal petition for a writ of habeas corpus was denied.   He appealed the decision in the United Sates Court of Appeals, 9th

District on an unknown date. The appeal was dismissed. Petitioner does not allege that he has filed any habeas petitions with this Court previously, and the Alameda Court file does not contain any prior petitions for a writ of habeas corpus. To the extent that Petitioner relies on *Apprendi*, Petitioner fails to establish an absence of substantial delay, good cause for the substantial delay, fails to explain why the Petition is exempt from the timeliness requirement, and does not claim that there is new evidence and/or information. (*In re Clark* (1993) 5 Cal.4th 750, 774; *In re Robbins* (1998) 18 Cal.4th 770, 780-781 and *In re Gallego* (1998 18 Cal.4th 825, 833.)

Assuming that the petition was timely as it relates to any claims based on *Apprendi*, it would nonetheless be denied. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S at p. 490.) In *Apprendi*, defendant pleaded guilty to two counts of an offense that carried a prison term of 5 to 10 years, and as part of the plea agreement, the prosecution reserved the right to request an enhanced sentence. The prosecution then filed a motion to enhance the sentence by a separate statute, which had not been referred to in the charging document. The trial judge found that the enhancement, which was based on racial intimidation, true and sentenced the defendant to beyond the 10 years. This case is distinguishable from *Apprendi*. Here, the jury found Petitioner guilty of manslaughter, which carries a term of 3, 6 or 11 years. (See Penal Code §193.) The jury also found true the

enhancement pursuant to Penal Code §12022.5, which carries a prison term of 3, 4, and 10 years.   The sentencing judge sentenced Petitioner based on the range of those statutes, not based on a separate statute, as did the *Apprendi* court.  *Apprendi* did not define what constitutes the "prescribed statutory maximum." Therefore, based on the facts of *Apprendi,* the sentencing judge determined the sentenced based on the "prescribed maximum terms" as was prescribed by the substantive criminal statutes of which Petitioner had been convicted by a jury.   Thus, *Apprendi* would not have invalidated Petitioner's sentence.

Petitioner also relies on *Cunningham.  Cunningham* relied on *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296, and *United States v. Booker* (2005) 543 U.S. 220. As such, it does not appear that *Cunningham* announced a new rule. (See *Saffle v. Parks* (1990) 494 U.S. 484, 488.) This Court does not believe *Cunningham* applies only to cases not yet final as of January 22, 2007, the date of the decision.   *Blakely,* unlike *Apprendi*, did call into question what constitutes "the prescribed statutory maximum." Thus, the retroactivity of *Cunningham* goes back to *Blakely,* which was decided on June 24, 2004.

The United States Supreme Court granted certiorari in *Burton v. Stewart* (2007) 549 U.S. ___ , 127 S. Ct. 793 (*Stewart*) to decide whether *Blakely* announced a new rule and, if so, whether it applies retroactively on collateral review.   However, the *Stewart* Court did not reach the issue because of a jurisdictional defect in the petition. Nonetheless, recent United States Supreme Court precedent indicates that

4

*Blakely* is not a new substantive rule that applies retroactively to cases already final on direct review, but a new rule of procedure without retroactive application. (See *Schriro v. Summerlin* (2004) 542 US 348 [holing that *Ring v. Arizona* (2002) 536 U.S. 584 is not retroactive to cases already final on direct review]; *Whorton v. Bockting* (2007) 549 U.S. ____, 127 S. Ct. 1173, 2007 U.S. LEXIS 2826 [holding that *Crawford v. Washington* (2004) 541 U.S. 36, is not retroactive to cases already final on direct review.].)

Moreover, California court of appeal decisions, binding on this court, have held that *Blakely* is merely a procedural rule that is not subject to retroactive application to cases final as of the date it was filed. (*See People v. Amons* (2005) 125 Cal.App.4th 855, 866; *In re Consiglio* (2005) 128 Cal.App.4th 511, 516; *Schardt v. Payne* (2005) 414 F.3d 1025, 1031.)

As indicated earlier, Petitioner's conviction and sentence were final for retroactivity purposes in 2000, well before the *Blakely* decision. Therefore, *Blakely* and *Cunningham* do not apply to Petitioner's case.

DATED: 4/30/07

_____
HON. LARRY GOODMAN
JUDGE OF THE SUPERIOR COURT

# EXHIBIT D

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE                                            1

STATEMENT OF FACTS                                              2

    The Prosecution Case                                    2

    The Defense Case                                        7

ARGUMENT                                                        8

I.   **THE SUPERIOR COURT PROPERLY DENIED HABEAS CORPUS RELIEF BECAUSE PETITIONER DID NOT PURSUE RELIEF UNDER *APPRENDI* ON DIRECT APPEAL OR BY TIMELY PETITION FOR WRIT OF HABEAS CORPUS AND BECAUSE NEITHER *CUNNINGHAM* NOR *BLAKELY* APPLIES RETROACTIVELY**                                8

    A.  Habeas Corpus Will Not Provide Belated Relief Where The Issue Could Have Been Raised On Appeal Or In An Earlier Habeas Corpus Proceeding                        8

    B.  *Teague* Principles Establish That *Cunningham* Is Not Retroactive                                      10

    C.  Analysis                                            11

II.  **PETITIONER'S CLAIM ALSO FAILS ON THE MERITS**                                               16

    A.  The *Cunningham* Decision                          16

    B.  The Recidivism Exception Applies In This Case      17

    C.  Any *Cunningham* Error Was Harmless In This Case    20

CONCLUSION                                                      24

## TABLE OF AUTHORITIES

Page

**Cases**

*Apprendi v. New Jersey*
(2000) 530 U.S. 466                                2, 16, 17

*Beard v. Banks*
(2004) 542 U.S. 410                                11

*Black v. California*
(2007) ___ U.S. ___
127 S.Ct. 1210
167 L.Ed.2d 36         .                          12

*Blakely v. Washington*
(2004) 542 U.S. 296                                2, 16-18

*Caspari v. Bohlen*
(1994) 510 U.S. 383
114 S. Ct. 948
127 L. Ed. 2d 236                                  11

*Chamberlain v. Pliler*
(C.D.Cal. 2004) 307 F.Supp.2d 1128                 21

*Chapman v. California*
(1967) 386 U.S. 18                                 20

*Crawford v. Washington*
(2004) 541 U.S. 36                                 14

*Cunningham v. California*
(2007) 549 U.S. ___
27 S.Ct. 856
166 L.Ed.2d 856                                   2, 13, 16-18, 22

*Espinosa v. Florida*
(1992) 505 U.S. 1079                               12

## TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| *Gideon v. Wainwright*<br>(1963) 372 U.S. 335 | 15 |
| *Horn v. Banks*<br>(2002) 536 U.S. 266 | 11 |
| *In re Clark*<br>(1993) 5 Cal.4th 750 | 8 |
| *In re Consiglio*<br>(2005) 128 Cal.App.4th 511 | 11, 15 |
| *In re Harris*<br>(1993) 5 Cal.4th 813 | 10 |
| *In re Robbins*<br>(1988) 18 Cal.4th 770 | 8, 9 |
| *In re Stankewitz*<br>(1985) 40 Cal.3d 391 | 8 |
| *In re Swain*<br>(1949) 34 Cal.2d 300 | 8 |
| *Lambrix v. Singletary*<br>(1997) 520 U.S. 518<br>117 S. Ct. 1517<br>137 L. Ed. 3d 771 | 12 |
| *Neder v. United States*<br>(1999) 527 U.S. 1 | 21 |
| *Ohio v. Roberts*<br>(1980) 448 U.S. 56 | 14 |
| *People v. Amons*<br>(2005) 125 Cal.App.4th 855 | 15 |

TABLE OF AUTHORITIES  (continued)

Page

*People v. Avalos*
(1984) 37 Cal.3d 216                                            23

*People v. Black*
(2005)  35 Cal. 4th1238                        12, 16, 17, 19, 23

*People v. Cleveland*
(2001) 87 Cal.App.4th 263                                       20

*People v. Earley*
(2004) 122 Cal.App.4th 542                                      17

*People v. Epps*
(2001) 25 Cal.4th 19                                            17

*People v. Forrester*
(1994) 30 Cal.App.4th 1697                                      23

*People v. Kelley*
(1997) 52 Cal.App.4th 568                                       23

*People v. McGee*
(2006) 38 Cal.4th 682                                           17

*People v. Osband*
(1996) 13 Cal.4th 622                                        17, 21

*People v. Prather*
(1990) 50 Cal.3d 428                                            17

*People v. Reyes*
(2007) ___ Cal.App.4th ___
2007 WL 1345904 at *10                                17, 18, 21, 22

*People v. Sengpadychith*
(2001) 26 Cal.4th 316                                        10, 20

TABLE OF AUTHORITIES  (continued)

Page

*People v. Thomas*
(2001) 91 Cal.App.4th 212                                      17

*Ring v. Arizona*
(2002) 536 U.S. 584                                           18

*Schardt v. Payne*
(9th Cir. 2005) 414 F.3d 1025                              12, 15

*Schriro v. Summerlin*
(2004) 542 U.S. 348
124 S.Ct. 2519
159 L.Ed.2d 442                                           14, 15

*State v. Gomez*
(Tenn. 2005) 163 S.W.3d 632                                   12

*State v. Maugaotega*
(Haw. 2005) 114 P.3d 905                                      12

*State v. Natale*
(N.J. 2005) 878 A.2d 724                                      23

*Teague v. Lane*
(1989)  489 U.S. 288                                           8

*United States v. Booker*
(2005) 543 U.S. 220                              12, 13, 16, 17

*United States v. Cruz*
(9th Cir. 2005) 423 F.3d 1119                              12-14

*Washington v. Recuenco*
(2006) ___U.S. ___
126 S.Ct. 2546
165 L.Ed.2d 466                                           20, 21

TABLE OF AUTHORITIES  (continued)

Page

*Whorton v. Bockting*
(2007) ___ U.S. ___
127 S.Ct. 1173
167 L.Ed.2d 1                                                    11, 13-15


**Constitutional Provisions**

United States Constitution
        Sixth Amendment                                   12, 13, 16, 18
        Fourteenth Amendment                                          16


**Statutes**

Penal Code
        § 1170                                                        23


**Other Authorities**

Senate Bill 40
(2007-2008 Reg. Sess.)                                                23

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re<br><br>**LADELL DICKERSON,**<br><br>On Habeas Corpus. | A117975 |

By letter dated June 6, 2007, this Court requested opposition to the petition for writ of habeas corpus.

## STATEMENT OF THE CASE

A jury found petitioner guilty of voluntary manslaughter (as a lesser included offense within the charged murder) and found true a personal firearm use enhancement. On May 24, 1999, the trial judge sentenced petitioner to 21 years in prison, comprised of the aggravated base term of 11 years on the voluntary manslaughter, enhanced with the aggravated term of 10 years on the enhancement. (2 CT 401-402.)

Petitioner appealed on three grounds, error in the self-defense instructions, prosecutorial misconduct at closing argument, and abuse of discretion in sentencing to the upper term for manslaughter and personal firearm use. On appeal, this Court affirmed the judgment. (*People v. Dickerson* (Apr. 3, 2000, A087362) [nonpub. opn.]; attached as exh. 1.) The remittitur in petitioner's appeal issued on June 27, 2000, following the June 14, 2000, denial of a petition for review by the California Supreme Court in case No. S088082. (Exh. 2.)

Petitioner filed in the trial court on March 1, 2007, a petition for writ of habeas corpus alleging that his upper-term sentence and upper-term

enhancement violated *Cunningham v. California* (2007) 549 U.S. ___ [127 S.Ct. 856, 166 L.Ed.2d 856] (*Cunningham*), *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), and *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*). In an order filed March 15, 2007, the superior court denied the petition. (Petn. Exh. C.) The present petition raises the same issues.

## STATEMENT OF FACTS

Petitioner pumped nine fatal bullets into unarmed James Aubrey's body. Eight of those bullets struck Aubrey in the back, including one shot fired into the lower spine from a distance of less than two feet. Petitioner admitted shooting Aubrey but claimed he was acting in reasonable or unreasonable self-defense because he thought Aubrey was reaching for a weapon.

### The Prosecution Case

At one point, petitioner and James Aubrey were friends. (2 RT 228.) Aubrey lived in an apartment at 1900 Seminary in Oakland until he was evicted for suspicion of drug sales. (2 RT 154-155; 5 RT 523.) After his eviction, Aubrey continued to sell crack cocaine out of his girlfriend's apartment, No. 1 at 1900 Seminary. (2 RT 209, 214, 219-220; 5 RT 523.) Petitioner regularly visited apartment No. 4 in that building. (2 RT 154-155.)

On Friday, January 31, 1997, Francis Iuli, the occupant of apartment No. 3, heard petitioner arguing with others outside 1900 Seminary. She reported petitioner said that "his friends and nobody else could sell drugs from that building because it's his turf." (2 RT 155-156, 215-216, 222.)

In the early afternoon of February 2, 1997, Francis Iuli finished having brunch with her sister Angel. (2 RT 156-157.) Angel left the apartment to buy cigarettes. Because Angel was nine months pregnant, Iuli kept an eye out for her at all times. As Angel walked to the store, Iuli watched through her

apartment window. (2 RT 157-158, 188.) She saw Angel meet Aubrey, who had parked his white Ford Explorer on Seminary. Standing by a fire hydrant, Aubrey rubbed Angel's stomach. Angel continued to the store, and Aubrey crossed Bromley, heading toward Seminary. Iuli cleaned up the dishes. (2 RT 158-159, 211.)

Three to four minutes later, Iuli returned to the window. She saw Angel coming back up the street and Aubrey coming down Seminary toward his truck. Petitioner was standing near the gate to the apartment building. (2 RT 159-160.) Petitioner nodded to Aubrey, as if to say, "Come on over." (2 RT 160-161.) Petitioner and Aubrey walked toward each other. (2 RT 161, 164.) Aubrey's hands were visible, and Iuli did not see Aubrey reach toward his waistband. (2 RT 162, 182, 202, 204.) Iuli heard a shot and looked toward her sister. She then looked back and saw Aubrey fall to the ground. Petitioner stood over Aubrey and fired many more shots. Iuli heard about six shots in total. After firing repeatedly into Aubrey's body, petitioner ran up the stairs of the apartment building directly beneath Iuli's window. (2 RT 162-166, 190.)

A terrified Iuli called 911, grabbed some clothes and ran out of her apartment. She fled to 90th Avenue and East 14th Street and made a second 911 call from a phone booth. (2 RT 167-168.) To calm her shattered nerves, Iuli then drank two 16-ounce beers and a pint of Hennessey brandy, took two Valium tablets and maybe smoked a joint. (2 RT 178-179, 198-199.) Sergeant Larson contacted Iuli, brought her to the police station, and took a statement from her beginning at 11:16 p.m. (2 RT 257-258.) Iuli identified petitioner as the shooter from a photo display. She said petitioner shot Aubrey in the front of his body, Aubrey went down, then petitioner stood over him and shot him five more times for a total of six shots. (2 RT 261-266.) Iuli did not state that petitioner had motioned Aubrey over to him prior to the shooting, although Iuli implied that in one of her responses. (2 RT 275-276, 289.)

3

Meanwhile, while Iuli fled, Officer Shannon Barbour heard the gunshots and was the first officer on the scene. She found Aubrey face down in a pool of blood. She called for additional units and secured the area. (2 RT 234-245.) An evidence technician collected from the street a total of nine .40-caliber casings, all marked ELD brand, S & W (Smith & Wesson). The technician also recovered several expended slugs, including three found under Aubrey's body. (3 RT 319-342.) There were no weapons near the body. (3 RT 309, 345.) Three was no blood trail leading to the body, indicating that Aubrey fell where he was shot. (2 RT 274-275.) A Primatene Mist asthma inhaler also was found beneath Aubrey's body. (3 RT 341-342.) The police also recovered some items from Aubrey's truck, including two Greyhound tickets to Reno and a bag containing toiletries. (3 RT 346-348, 373.)

An employee of the coroner's office searched Aubrey's body and found a knife inside his pocket, one earring, two gloves, miscellaneous papers, two business cards, a California identification card for a Randy Rochelle, and $131.69. (5 RT 526-536.)

Police found a box of .40-caliber ELD brand, S & W ammunition under a mattress in apartment No. 4 at 1900 Seminary. (3 RT 418.) The box was missing 10 rounds, as indicated by 10 empty holes in the styrene inside the box. (3 RT 419, 421.) In the same bedroom as the box of ammunition, the police found a large envelope bearing petitioner's name. (3 RT 420.) Police found another document bearing petitioner's name in the kitchen. (3 RT 417.)

Pathologist Paul Hermann performed an autopsy on Aubrey's body on February 3, 1997. Aubrey died from nine gunshot wounds. Aubrey had one bullet entry wound to the front of his body caused by a bullet that entered his chest near the left nipple, passed through his heart and came out his back. Aubrey also had eight entry wounds in his back. Two bullets had entered the upper left side of Aubrey's back, traveled up through the neck and lodged in his

4

face. Another bullet entered the left upper back, passed through the clavicle, and out the right back. Another bullet entered the back of Aubrey's head and passed left to right through his head. Another bullet entered Aubrey's back at his lower spine, passed through his liver, hit his seventh rib and exited his right chest. Another bullet struck Aubrey's upper left back but went no further. Another bullet entered Aubrey's lower back and passed upward and out the right side of his chest. This bullet wound had left gunpowder stippling, indicating the shot was fired into Aubrey's back from no more than 18 to 24 inches away. (3 RT 383-395.) Internal hemorrhaging indicated that Aubrey was alive when he received all nine bullet wounds. (3 RT 395-396.)

After killing Aubrey, petitioner fled to Utah and hid with a relative. (4 RT 442, 445.) Utah authorities arrested petitioner in early May, 1997. Sergeant Madarang went to Utah to extradite petitioner. On May 9, 1997, Sergeant Madarang advised petitioner of his right to remain silent and to consult with an attorney, took oral and signed waivers of those rights from petitioner, and interviewed him. (4 RT 435-437.) Petitioner stated that some time prior to the killing, petitioner had been with Aubrey in Aubrey's car when a police officer had tried to stop them. Aubrey, the driver, sped away. During the ensuing chase, Aubrey threw a gun out the window. The police caught the car, recovered the gun and arrested Aubrey. Since that day, Aubrey was angry with petitioner because Aubrey suspected petitioner had helped the police connect the evidence of the gun to Aubrey for prosecution purposes. (4 RT 439.) Petitioner believed Aubrey was capable of harming him and feared for his safety. (4 RT 449-450.)

On the day of the shooting, continued petitioner's story, Aubrey drove up, got out and started walking toward him. Aubrey said something petitioner could not understand. When he got within 10 to 15 feet of petitioner, Aubrey reached toward his waist area. Thinking Aubrey was reaching for a weapon,

petitioner pulled his own .40-caliber semiautomatic handgun and shot Aubrey. (4 RT 439-440, 456.)

Asked to describe the weapon for which Aubrey reached, petitioner admitted that he never saw a weapon. Asked why he had fired so many rounds, petitioner said that Aubrey just would not go down. Asked the location of the weapon he had used, petitioner said he did not want to tell the police because he felt that the district attorney would have a harder time prosecuting the case without the weapon. (4 RT 440.) Petitioner added that he thought the district attorney was going to have a hard time prosecuting the case. Petitioner explained that he had hired an attorney, obtained the names of all the witnesses, thought that those witnesses would never show up and knew the district attorney did not have the weapon. (4 RT 440-441.) Petitioner did not explain why, if Aubrey had arrived and approached unexpectedly, petitioner happened to be armed with a fully loaded semiautomatic weapon.

Following petitioner's arrest, Iuli testified at the preliminary hearing. Afraid of being involved in this graphic case, Iuli failed to state that petitioner motioned Aubrey over before the shooting and that petitioner and Aubrey then walked toward each other. (2 RT 176-177.) As Iuli explained at trial, she had grave fears about being involved in this murder case, which were compounded when she saw petitioner's family and friends in the street. (2 RT 176-177, 184-185, 209.)

The parties stipulated that at about 8:34 p.m. on October 24, 1996, Oakland police officers stopped a car driven by Aubrey for speeding. As the officers approached, Aubrey sped away. A high speed chase ensued, during which police saw Aubrey throw a silver metallic object from the driver's side window in the 1100 block of 82nd Avenue. The officers finally stopped the car and confirmed that Aubrey was the driver and petitioner the passenger. The police arrested Aubrey and recovered a nickel-plated semiautomatic .380-

6

caliber pistol containing five live rounds in front of 1115 82nd Avenue. The police did not arrest petitioner. Aubrey was released from custody one day later on the grounds of insufficient evidence for filing criminal charges, and was not thereafter charged with a criminal offense. (5 RT 523-525.)

Aubrey was 6 feet 2 inches tall and weighed 318 pounds. (3 RT 397.) When arrested, petitioner weighed 225 pounds. (4 RT 448.)

### The Defense Case

Petitioner's first cousin is the father of Meleena Gaspard's child. (6 RT 595-596.) Gaspard, who was 21 at the time of trial, had known petitioner for 10 years. (6 RT 596.) Gaspard claimed once, that when she was driving with Aubrey in his car near Seminary, Aubrey said he was going to kill petitioner. (6 RT 592-593, 597, 599.) According to Gaspard, this conversation took place in March 1997. (6 RT 597.) She so dated the statement because she specifically remembered beginning to date Aubrey around Christmas 1996, and Aubrey's purported comment occurred about three months later. (6 RT 591-592, 596-597.) Gaspard further claimed she told another of petitioner's first cousins, Antoinette Dickerson, that petitioner should watch out because Aubrey was out to kill him. (6 RT 583-586, 592, 594.) Gaspard never attempted to contact the police or district attorney and inform them of this alleged comment by Aubrey. (6 RT 597.) She first disclosed the content of the alleged conversation to defense counsel on the Friday preceding her Monday trial testimony. (6 RT 597.)

Petitioner's cousin Antoinette claimed to have relayed the alleged Aubrey comment to petitioner. (6 RT 584.) Antoinette also dated the conversation at March 1997. (6 RT 586-587.) She also never contacted the police or district attorney. (6 RT 589.) Antoinette would hate to see petitioner go to prison. (6 RT 585.)

## ARGUMENT

## I.

## THE SUPERIOR COURT PROPERLY DENIED HABEAS CORPUS RELIEF BECAUSE PETITIONER DID NOT PURSUE RELIEF UNDER *APPRENDI* ON DIRECT APPEAL OR BY TIMELY PETITION FOR WRIT OF HABEAS CORPUS AND BECAUSE NEITHER *CUNNINGHAM* NOR *BLAKELY* APPLIES RETROACTIVELY

Petitioner's appeal became final just after *Apprendi* issued, but before either *Blakely* or *Cunningham* issued. He is not entitled to relief, since he has foregone the opportunity to rely on *Apprendi*, since *Apprendi* does not address his situation, and since neither *Cunningham* nor *Blakely* applies retroactively. (*Teague v. Lane* (1989) 489 U.S. 288, 310.)

**A.   Habeas Corpus Will Not Provide Belated Relief Where The Issue Could Have Been Raised On Appeal Or In An Earlier Habeas Corpus Proceeding; Petitioner Does Not State A Claim Under *Apprendi***

To the extent petitioner bases his request for relief on *Apprendi* (Petn. at pp. 9-13), the time to do that was on his direct appeal or in a timely petition for state habeas corpus relief. As he pursued neither path, he is not entitled to relief under *Apprendi*. Moreover, as will be shown, *Apprendi* alone would not afford him relief, even had he made a timely effort to obtain it.

As the trial court below held in denying petitioner's petition, this claim is untimely. California courts have repeatedly held that claims in a habeas petition must be timely filed. (*In re Robbins* (1988) 18 Cal.4th 770, 778.) Unjustified delay in presenting habeas claims bars consideration of the merits of a petition. (*In re Clark* (1993) 5 Cal.4th 750, 759 (*Clark*); *In re Stankewitz* (1985) 40 Cal.3d 391, 396, fn. 1; *In re Swain* (1949) 34 Cal.2d 300, 302.) In order to avoid the untimeliness procedural bar, a petitioner must show: (1) absence of substantial delay; (2) good cause for the delay; or (3) that the

claim falls within an exception to the untimeliness bar. (*In re Robbins, supra,* 18 Cal.4th at p. 780.)

In the instant case, petitioner has failed to make the required showing. He acknowledges that *Apprendi* was decided before his direct appeal became final for retroactivity purposes, but asserts that by that time he was no longer represented by counsel. Lack of counsel did not prevent him from pursuing his legal rights in other arenas. Petitioner acknowledges he pursued federal habeas corpus relief in the United States District Court and the United States Court of Appeals for the Ninth Circuit. (See Petn. at p. 16.)

He also asserts that the ramifications of *Apprendi* were not understood until the *Cunningham* decision issued, so he should be excused from failing to assert his *Apprendi* claim until seven years after the *Apprendi* decision issued. Petitioner here appears to concede that he has a *Cunningham* claim or a *Blakely* claim, not an *Apprendi* claim.[1]/

Petitioner does not fall within the exception to the untimeliness bar, as upholding his sentence will not cause a fundamental miscarriage of justice. To come within this exception, a petitioner must demonstrate one of the following: (1) an error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) the petitioner is actually innocent of the crime or crimes of which he or she was convicted; (3) the death penalty was imposed by a sentencing authority that had such a grossly misleading profile of the petitioner before it, that absent the trial error or omission, no reasonable judge or juror would have imposed the sentence of death; or (4) the petitioner was

---

1. *Apprendi* addressed whether an uncharged and unproven hate-crime enhancement could be applied to impose a sentence that exceeded the sentencing range for the crime. (*Apprendi, supra,* 530 U.S. at p. 490.) Petitioner, whose personal gun-use enhancement was charged and found true by a jury beyond a reasonable doubt does not have an *Apprendi* claim.

convicted or sentenced under an invalid statute. (*In re Robbins*, *supra*, 18 Cal.4th at pp. 780-781.) Petitioner's argument addresses item four. He asserts that he was sentenced to a longer sentence than was permitted by law, relying on the companion case to *Clark*, *In re Harris* (1993) 5 Cal.4th 813, 839. As respondent explains in more detail below, however, his sentence is permitted by law, and would certainly be reimposed even if he were successful here. The conclusion that the sentence was not an abuse of discretion has been thoughtfully reached by this Court, upheld by denial of review in the California Supreme Court, and upheld in the federal courts as well. The issue petitioner raises is that a judge, rather than a jury, made the findings supporting his upper terms. *Apprendi* addressed the need for a jury finding beyond a reasonable doubt on the existence of an enhancement, not choices within sentencing ranges. Petitioner's enhancement having been found true by a jury beyond a reasonable doubt, his claim of *Apprendi* error would necessarily fail. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 326-327 ["This is what *Apprendi* teaches us: Except for sentence enhancement provisions that are based on a defendant's prior conviction, the federal Constitution requires a jury to find, beyond a reasonable doubt, the existence of every element of a sentence enhancement that increases the penalty for a crime beyond the 'prescribed statutory maximum' punishment for that crime."].) Moreover, since, as will be shown below, the facts supporting his upper terms were beyond dispute, no miscarriage of justice occurs if their finding by a judge, rather than a jury, is upheld. Accordingly, his petition must be denied on *Apprendi* grounds as untimely. If not untimely, the *Apprendi* claim fails on the merits.

**B.    *Teague* Principles Establish That *Cunningham* Is Not Retroactive**

The United States Supreme Court recently explained its *Teague* retroactivity principles:

In *Teague* and subsequent cases, we have laid out the framework
to be used in determining whether a rule announced in one of our
opinions should be applied retroactively to judgments in criminal
cases that are already final on direct review. Under the *Teague*
framework, an old rule applies both on direct and collateral review,
but a new rule is generally applicable only to cases that are still on
direct review. [Citation.] A new rule applies retroactively in a
collateral proceeding only if (1) the rule is substantive or (2) the rule
is a "'watershed rul[e]' of criminal procedure' implicating the
fundamental fairness and accuracy of the criminal proceeding."
[Citation.]

(*Whorton v. Bockting* (2007) ___ U.S. ___ [127 S.Ct. 1173, 1180, 167 L.Ed.2d
1] (*Bockting*).) "A new rule is defined as 'a rule that . . . was not *dictated* by
precedent existing at the time the defendant's conviction became final.'"" (*Id.*
at p. ____ [127 S.Ct at p. 1181], citation omitted.) "[T]he determination
whether a constitutional rule of criminal procedure applies to a case on
collateral review involves a three-step process." (*Beard v. Banks* (2004) 542
U.S. 410, 411 (*Banks*).)

First, the court must determine when the defendant's conviction
became final. Second, it must ascertain the "legal landscape as it then
existed," [citation], and ask whether the Constitution, as interpreted
by the precedent then existing, compels the rule, [citation]. That is,
the court must decide whether the rule is actually "new." Finally, if
the rule is new, the court must consider whether it falls within either
of the two exceptions to nonretroactivity. [Citation.]

(*Banks, supra,* 542 U.S. at p. 411; see *Horn v. Banks* (2002) 536 U.S. 266, 271,
fn. 5; see *In re Consiglio* (2005) 128 Cal.App.4th 511, 514.)


## C.   Analysis

As two published California cases establish, *Blakely* announced a new
rule that was not retroactive. (*In re Consiglio, supra,* 128 Cal.App.4th 511;
*People v. Amons* (2005) 125 Cal.App.4th 855.) Because petitioner relies on a
rule that does not apply, he is not entitled to relief.

A case becomes final for *Teague* purposes when "the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." (*Caspari v. Bohlen* (1994) 510 U.S. 383, 390 [114 S. Ct. 948, 127 L. Ed. 2d 236].) Since the California Supreme Court denied review of petitioner's direct appeal on June 14, 2000, his case became final with the expiration of 90 days in which to file a petition for writ of certiorari. Thus, for *Teague* purposes, petitioner's case became final on September 12, 2000, after *Apprendi* (June 26, 2000), but long before both *Blakely* (June 24, 2004) and *Cunningham* (January 22, 2007).

*Cunningham* announced a new rule for *Teague* purposes. Indeed, reasonable jurists could and did disagree after both *Apprendi* and *Blakely* whether that case impacted California's procedure for selecting upper terms. In the years since petitioner's case became final, at least two other state supreme courts with similar systems had rejected claims that their systems violated the Sixth Amendment in light of *United States v. Booker* (2005) 543 U.S. 220 (*Booker*), *Apprendi*, and *Blakely*. (See *State v. Lopez* (N.M. 2005) 123 P.3d 754, 761-68 [concluding its mandatory scheme complied with *Booker* and *Blakely* since it imposed a standard of reasonableness]; *State v. Gomez* (Tenn. 2005) 163 S.W.3d 632, 661-62, *judgment vacated and remanded,* ___ U.S. ___ [127 S.Ct. 1209, 167 L.Ed.2d 36] (2007); *see also State v. Maugaotega* (Haw. 2005) 114 P.3d 905, 916.) Many panels of a "sharply divided" California Court of Appeal, and the California Supreme Court itself, also found California's procedure constitutional, analogizing it to the system of reasonableness approved in the *Booker* remedial opinion. (See *People v. Black* (2005) 35 Cal. 4th 1238, 1244, 1253, 1259, vacated *sub. nom. Black v. California* (2007) ___ U.S. ___ [127 S.Ct. 1210, 167 L.Ed.2d 36].) The large number of jurists finding that California's upper term sentencing scheme and similar statutes did

not violate the Sixth Amendment demonstrates that the outcome in *Cunningham* was not so clear that no reasonable jurist could have reached a contrary result. (See *United States v. Cruz* (9th Cir. 2005) 423 F.3d 1119, 1120; *Schardt v. Payne* (9th Cir. 2005) 414 F.3d 1025, 1035; *see also Lambrix v. Singletary* (1997) 520 U.S. 518 [holding *Espinosa v. Florida* (1992) 505 U.S. 1079 that decided the judge and jury in capital case may not weigh invalid aggravating circumstances, is a new rule because reasonable jurists could have reached another outcome given prior precedent].)

Further, the Court's grant of certiorari in *Cunningham* suggests that its holding was not dictated by prior precedent. An important question of federal constitutional law needed to be "settled," presumably because the answer was not all clear. (See U.S. Supreme Ct. Rules, rule 10(c).) In the final analysis, not all the members of the Court agreed on the answer; rather, three justices dissented. (*Cunningham, supra,* 127 S. Ct. at pp. 876-881 (dis. opn. of Alito, J.); see *Cruz, supra,* 423 F.3d at p. 1120 [noting dissenting opinions in *Booker* when finding that case stated a new rule].).

Thus, in light of the legal landscape since the time petitioner's conviction became final in the year 2000, reasonable jurists would not have felt compelled to reach the same conclusion as the *Cunningham* majority. (See *Whorton v. Bockting, supra,* 127 S. Ct. at p. 1181 ["The new rule principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions"].) Even though the Supreme Court has now clarified that California's upper term sentencing violates the Sixth Amendment, granting relief to petitioner would require retroactive application of a new rule under *Teague*.

Since *Cunningham* announced a new rule, petitioner is not entitled to relief because: (1) his case was final for *Teague* purposes as of January 31, 2006; and (2) *Cunningham* did not announce a substantive rule or a watershed

rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding (see *Bockting, supra,* ___ U.S. at p. ___ [127 S.Ct. at p. 1180]). As the superior court noted in denying petitioner relief (Petn. Exh. C at pp. 4-5), if *Blakely* does not apply to cases that were final when it issued, even if *Cunningham* relates back to *Blakely,* a point respondent does not concede, it provides no relief to petitioner. In applying *Blakely* to the federal sentencing scheme, the *Booker* majority held that its holdings applied to "all cases on direct appeal" because it was announcing a clear break with the past. (*Booker, supra,* 543 U.S. at p. 268.) By implication, this means the high court viewed *Blakely* as announcing a new rule for *Teague* purposes. (*Ibid.; Cruz, supra,* 423 F.3d at p. 1120.)

Further, *Cunningham* is a procedural rule, not a substantive one. For *Teague* purposes, a substantive rule "includes decisions that narrow the scope of a criminal statute by interpreting its terms [citation], as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, [citations; fn. omitted]." (*Schriro v. Summerlin* (2004) 542 U.S. 348, 351-352 (*Summerlin*).)

> Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. [Citation.]

(*Id.* at p. 352.) *Blakely* and *Cunningham* merely announced that defendants were entitled to a jury determination of any fact that increases a sentence beyond the statutory maximum with the exception of the truth of a prior conviction allegation. These cases did not announce a substantive rule for *Teague* purposes, and, thus, *Teague's* substantive rule exception does not apply to petitioner's habeas claim. (*Schardt, supra,* 414 F.3d at pp. 1035-1036 [*Blakely* did not create a new substantive rule]; see *Cruz, supra,* 423 F.3d at p. 1120 [*Booker* did not create a substantive rule].)

14

Nor does the watershed-rule exception to the *Teague* rule apply. In *Bockting*, the high court explained:

> In order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent "an "'impermissibly large risk'"" of an inaccurate conviction. [Citations.] Second, the rule must "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." [Citation.]

(*Bockting, supra,* ___ U.S. at p. ___ [127 S.Ct. at p. 1182].) In *Bockting*, the high court held that its overruling of its Confrontation Clause rules in *Ohio v. Roberts* (1980) 448 U.S. 56, in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), was not watershed, and, thus, *Crawford* did not apply retroactively for *Teague* purposes. (*Bockting, supra,*127 S.Ct. at pp. 1183-1184.)

Here, even if *Blakely*'s and *Cunningham*'s jury determination rules were deemed "fundamental," that is ""'not enough.'" (See *Bockting, supra,* 127 S.Ct. at p. 1183.) "Instead, in order to meet this requirement, a new rule must itself constitute a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding." (*Ibid.*) Neither *Blakely* nor *Cunningham* effected a "profound and "'sweeping'" change" like *Gideon v. Wainwright* (1963) 372 U.S. 335 (*Gideon*), which announced that a court must appoint counsel for all indigents charged with a felony. (*Bockting, supra,* 127 S.Ct. at p. 1184.) As the high court said this year in *Bockting, Gideon* is "the only case that we have identified as qualifying" for watershed status. (*Id.* at p. 1182.) Similarly, its 2004 and 2007 opinions in *Blakely* and *Cunningham* do not deserve watershed status. (*Schardt, supra,* 414 F.3d at p. 1036; *Consiglio, supra,* 128 Cal.App.4th at pp. 514-516; *People v. Amons, supra,* 125 Cal.App.4th at pp. 863-868.)

Since *Cunningham*, like *Blakely*, announced a new rule under *Teague* and does not come under any *Teague* exception warranting retroactive effect, the superior court properly denied petitioner habeas relief. Petitioner's

*Cunningham* challenge to his upper term sentence fails.

## II.

## PETITIONER'S CLAIM ALSO FAILS ON THE MERITS

Petitioner's claims also fail on the merits because his upper-term sentence was based on recidivism factors, his personal gun use enhancement was found true by the jury and selection of the upper term for the enhancement was based on undisputed facts presented to the jury.

### A.   The *Cunningham* Decision

*Cunningham* held that California's procedure for selecting upper terms violates the defendant's Sixth and Fourteenth Amendment right to jury trial because it "assigns to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence." (*Cunningham, supra*, 127 S.Ct. at p. 860.)  The court explained that "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Ibid.*, citing, inter alia, *Apprendi v. New Jersey, supra*, 530 U.S. 466, *Blakely v. Washington, supra*, 542 U.S. at p. 296, and *United States v. Booker, supra*, 543 U.S. at p. 220.)  The high court found that because Penal Code section 1170, subdivision (b), and the implementing California Rules of Court, allow for imposing an upper term only by a fact that a judge finds by a preponderance of the evidence, the jury trial and reasonable doubt requirements of due process are missing in California's "DSL" system. (*Cunningham, supra*, 127 S.Ct. at p. 868.)  In reaching this decision, the high court rejected *People v. Black, supra*, 35 Cal.4th 1238, the California Supreme Court's decision

16

holding that California's upper term procedure was constitutional under
*Apprendi*, *Blakely*, and *Booker*. (*Cunningham*, *supra*, 127 S.Ct. at pp. 868-
871.)[2]

## B.   The Recidivism Exception Applies In This Case

Even though *Cunningham* generally precludes a trial court from
finding facts to impose an upper term sentence, and even though *Cunningham*
holds that the middle term is the statutory maximum, there was no *Cunningham*
violation in this case. Under *Almendarez-Torres v. United States* (1998) 523
U.S. 224, a defendant does not have a right to a jury trial for a sentence based
on the fact of a prior conviction. (*Id.* at 246; accord, *Cunningham*, *supra*, 127
S.Ct. at p. 860; *Booker*, *supra*, 543 U.S. at p. 244; *Blakely*, *supra*, 542 U.S. at
p. 301; *Apprendi*, *supra*, 530 U.S. at p. 488.) Further, this *Almendarez-Torres*
exception goes beyond the mere fact of a prior conviction to include matters
such as the sentence imposed and the status and timing of the defendant's
incarceration in relation to subsequent offenses. (See *People v. Thomas* (2001)
91 Cal.App.4th 212, 221-222 ["Courts have not described *Apprendi* as
requiring jury trials on matters other than the precise 'fact' of a prior conviction.
Rather, courts have held that no jury trial right exists on matters involving the
more broadly framed issue of 'recidivism'"], cited with approval in *People v.
McGee* (2006) 38 Cal.4th 682, 700-703; see also *People v. Epps* (2001) 25
Cal.4th 19, 26; *People v. Prather* (1990) 50 Cal.3d 428, 439-440.) The jury

---

2.   On February 7, 2007, the California Supreme Court granted review
in five cases to address the impact of *Cunningham*. (See *People v. Sandoval*
(S148917), *People v. Mvuemba* (S149247), *People v. French* (S148845),
*People v. Hernandez* (S148974), and *People v. Pardo* (S148914).) The Court
also requested supplemental briefing in *People v. Towne* (S125677), review
granted July 14, 2004, and in *People v. Black*, *supra*, 35 Cal.4th at p. 1238, on
remand from a grant of writ of certiorari in *Black v. California* (Feb. 20, 2007)
___ U.S. ___ [2007 WL 505809], on the effect of *Cunningham*. The Supreme
Court heard oral argument in *Black* and *Sandoval* on May 29, 2007.

trial right thus does not extend to an aggravating circumstance based on petitioner's criminal record.

In addition, a single aggravating circumstance is sufficient to render a defendant *eligible* for the upper term. (*People v. Reyes* (2007) ___ Cal.App.4th ___ [2007 WL 1345904 at *10]; *People v. Osband* (1996) 13 Cal.4th 622, 728-729; *People v. Earley* (2004) 122 Cal.App.4th 542, 550; see also *Cunningham, supra,* 127 S.Ct. at p. 860 [the middle term was required "unless the judge found one or more additional facts in aggravation"]; *id.* at p. 868 ["an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance"]; *People v. Black, supra,* 35 Cal.4th at p. 1255 [Section 1170, subdivision (b) mandates "that the middle term be imposed unless an aggravating factor is found"].) Thus, the presence of a single circumstance in aggravation renders a defendant *eligible* for the upper term and provides the trial court with the statutory *authority* to impose the upper term, irrespective of the particular term the court ultimately imposes after conducting the requisite balancing. (*People v. Reyes, supra,* 2007 WL 1345904 at *10; see generally *Cunningham, supra,* 127 S.Ct. at p. 865, quoting *Blakely, supra,* 542 U.S. at p. 305 [the constitutional test focuses on the judge's "authority to impose an enhanced sentence," regardless of whether the "enhanced sentence depends on finding a specified fact" (as in *Apprendi*), "one of several specified facts" (as in *Ring v. Arizona* (2002) 536 U.S. 584), "or *any* aggravating fact (as here)"].) Hence, a trial court's finding of a single aggravating circumstance based on the defendant's criminal history falls within the recidivism exception to the jury-trial requirement and is sufficient to authorize the imposition of an upper term sentence under the Sixth Amendment. (*People v. Reyes, supra,* 2007 WL 1345904 at *10; see also *People v. Black, supra,* 35 Cal.4th at p. 1270 (conc. & dis. opn. of Kennard, J.).)

In the present case, the court imposed the upper term for voluntary

manslaughter, citing petitioner's juvenile record, a prior felony conviction for possession for sale of narcotics, and the fact that petitioner was on probation at the time he committed the present crime. (2 CT 394.) Commenting on the aggravating factors noted by the probation officer, the court stated that the probation officer's notation that the offense involved great bodily injury did not describe an aggravating factor given the nature of the offense. In the next breath, the court agreed that petitioner was armed with a weapon, but in light of the use enhancement, apparently, did not specifically include that fact among the aggravating factors. The court confirmed that petitioner was on probation at the time of the offense and had performed poorly on probation. (2 CT 394; PR 6.)

The court disagreed with the probation officer's suggestion that petitioner had an insignificant record which could be considered a mitigating factor. The court agreed that the jury's verdict, finding only voluntary manslaughter, suggested the jury might have found the victim provoked the killing in some way, but did not find the matter "clear cut." (2 CT 395; PR 6.)

With respect to the gun use enhancement, the court expressed concern that petitioner had never disclosed the location of the weapon, and it openly hoped that the weapon would not be used in another act of violence. (2 CT 395.) The court specifically found that the personal firearm use enhancement can be earned by displaying the gun in a menacing manner, intentionally firing it, striking or hitting someone with it. By contrast, firing seven additional shots into the head and body of a victim who is already down warrants the aggravated term on the enhancement. (2 CT 395-397.)

These facts are easily provable with petitioner's criminal records (prior conviction, poor performance on probation, on probation when crime committed) or admitted by him (continued shooting at Aubrey because he just would not go down, kept location of gun secret).

19

Under these circumstances, the court had the authority to impose the upper term, and could properly find other aggravating circumstances in evaluating whether to impose the upper term. Thus, the trial court's additional aggravating circumstance findings did not violate *Cunningham*.

## C. Any *Cunningham* Error Was Harmless In This Case

*Apprendi* or *Blakely* error is subject to review under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Washington v. Recuenco* (2006) __ U.S. ___ [126 S.Ct. 2546, 2553, 165 L.Ed.2d 466]; *People v. Sengpadychith, supra,* 26 Cal.4th at p. 327.) Likewise, since *Cunningham* is an application of *Apprendi* and *Blakely*, *Cunningham* error should be subject to *Chapman* harmless error review. This Court must determine whether the jury would have found an aggravating circumstance true beyond a reasonable doubt. (See *Chapman, supra,* 386 U.S. at p. 24.) Any error as to an aggravating circumstance is harmless if the evidence at trial and sentencing consisted of overwhelming or uncontradicted evidence as to that circumstance. (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 327; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271 [finding any *Apprendi* error for a finding under section 654 to be harmless beyond a reasonable doubt because "[w]e have no doubt a jury would have reached the same conclusion [as the trial court] under the reasonable doubt standard"]; *Chamberlain v. Pliler* (C.D.Cal. 2004) 307 F.Supp.2d 1128, 1142-1143 [holding that any *Apprendi* error from the failure to submit a personal-use finding to the jury was harmless because "[p]etitioner has adduced no evidence to contradict the evidence considered by the trial court, which included the victim's testimony that petitioner had pulled out a knife and struck the victim in the head with a shiny object cutting him and leaving a scar"]; see also *Neder v. United States* (1999) 527 U.S. 1, 17 [finding erroneous instruction omitting element of the offense harmless "where a

reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence"], cited with approval in *Washington v. Recuenco, supra,* 126 S.Ct. at p. 2552 [describing *Neder* inquiry as "asking whether the jury would have returned the same verdict absent the error"].)

If the reviewing court determines that the jury would have found at least one of the aggravating circumstances true beyond a reasonable doubt, the defendant was not prejudiced under *Cunningham*. *Cunningham* error only occurs if the jury did not find the necessary fact that *authorizes* the imposition of, or makes the defendant *eligible* for, the increased sentence. Since a single aggravating circumstance is sufficient to authorize the imposition of the upper term sentence under state law (*People v. Reyes* (2007) ___ Cal.App.4th ___ [2007 WL 1345904 at *10]; *People v. Osband, supra,* Cal.4th at pp. 728-729], a determination that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt necessarily renders the *Cunningham* error harmless because that single aggravating circumstance would have authorized the upper-term sentence. The reviewing court would therefore affirm the defendant's sentence under such circumstances.

If the *Cunningham* error is harmless because the jury would have found at least one aggravating circumstance true, the reviewing court does not need to further determine whether the trial court would have imposed the same sentence in light of the *Cunningham* error. Such an additional inquiry is not required because *Cunningham* focuses on whether the jury made the necessary finding to *expose* the defendant to a higher sentence, rather than whether the trial court made the proper discretionary sentencing choice. (See *Cunningham, supra,* 127 S.Ct. at p. 860 ["sentence-elevating factfinding" which "expose[s] a defendant" to an upper term violates the right to jury trial]; *People v. Reyes, supra,* 2007 WL 1345904 at *10.) Thus, the *Chapman* inquiry required to

21

vindicate that federal constitutional right is limited to the question of whether the jury would have found at least one aggravating circumstance true, exposing the defendant to the upper term.

The upper term for voluntary manslaughter was based on the aggravating factors related to petitioner's recidivism. The upper term on the weapon use enhancement was base on the uncontested and overwhelming evidence that petitioner's personal use of the firearm went far beyond menacing display, assault, or a single intentional firing, as he stood over the victim and fired into his head and back seven additional times. Anyone considering these facts would consider petitioner's actions to merit more than the minimum or average term for personal firearm use. Accordingly, any *Cunningham* error was harmless because the upper term sentence on the offense and the enhancement would have been authorized by any one of the aggravating circumstances found by the trial court in imposing the sentence.

Finally, even if it were assumed that this Court must examine whether the trial court would have imposed the upper term in light of any aggravating circumstances that would not have been found true by the jury, it is beyond a reasonable doubt that the jury would have found all, or at least most, of the aggravating circumstances true.    They were simply beyond dispute. Accordingly, any error was harmless. (See *People v. Avalos* (1984) 37 Cal.3d 216, 233; *People v. Kelley* (1997) 52 Cal.App.4th 568, 581 & fn. 18.)[3/]

_____

3. Should this Court disagree that there was no prejudicial error in this case, respondent notes that the People have previously argued in *People v. Black, supra*, 35 Cal.4th 1238, and *People v. Towne*, review granted July 14, 2004, S125677, that the California Supreme Court should judicially reform Penal Code section 1170 to eliminate any factfinding requirement. The Legislature amended section 1170 in this manner to comply with *Cunningham*. (See Sen. Bill 40, approved by Governor, Mar. 30, 2007 (2007-2008 Reg. Sess.), at <http://www.leginfo.ca.gov/bilinfo.html> [as of Apr. 4, 2007].) Thus, although this Court technically has the power to reform an unconstitutional statute (see, e.g., *People v. Forrester* (1994) 30 Cal.App.4th 1697, 1703), the

## CONCLUSION

Accordingly, respondent respectfully requests that the petition for writ of habeas corpus be denied.

Dated:  June 28, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

SETH K. SCHALIT
Supervising Deputy Attorney General

CATHERINE A. RIVLIN
Supervising Deputy Attorney General

Attorneys for Respondent

CAR/car/gm

---

more prudent course of action may be to stay these proceedings and await direction from the California Supreme Court on the proper remedy. (See, e.g., *State v. Natale* (N.J. 2005) 878 A.2d 724, 739-745 [New Jersey Supreme Court reformed sentencing system by removing presumptive middle term, and ordered that each impacted case be remanded for the trial court to determine whether it would have imposed the same sentence under the reformed system].)

23

# EXHIBIT E

1

2    Ladell Dickerson, P-48453

3    CSP, Corcoran, 3A01-249

4    P.O. BOX 3461

5    CORCORAN, CA 93212

6

7    In Pro Se

8

9                 IN THE CALIFORNIA COURT OF APPEAL

10               FIRST APPELLATE DISTRICT, DIVISION ONE

11    _____
                                     )
12    In Re LADELL DICKERSON,         )    A117975
                                     )
13             On Habeas Corpus.      )    REPLY TO RESPONDENT'S OPPOSITION
                                     )
14    _____

15

16        Habeas petitioner, a state prisoner, hereby replies to the

17    contentions raised in the BRIEF IN OPPOSITION TO PETITION FOR WRIT

18    OF HABEAS CORPUS, (OPPOSITION).

19

20                    STATEMENT OF THE CASE

21        Petitioner is in agreement with the STATEMENT OF THE CASE

22    delineated in the OPPOSITION.

23

24                    STATEMENT OF THE FACTS

25        In light of the jury's verdict finding voluntary manslaughter

26    instead of murder which manifested an acceptance of petitioner's

27    defense-that he acted in self defense, petitioner believes the

28    STATEMENT OF THE FACTS should so reflect.

COURT PAPER
ATE OF CALIFORNIA
D. 113 (REV. 8-72)

34769

1

1

2     Petitioner and the victim, James Aubrey, were at one time

3  friends. (RT 228).  On one occasion petitioner had gotten a ride

4  from Aubrey and while driving a police officer attempted to effect

5  a traffic stop.  Aubrey sped away and a chase ensued.  During the

6  chase Aubrey threw a gun out the window.  The chase continued and

7  when Aubrey finally stopped he was arrested. (RT. 439)  The gun was

8  recovered as well. (RT 439)  Even though he was released the next

9  day and all charges were dropped, Aubrey accused petitioner of

10  snitching Aubrey out. (RT 439)  Since then, Aubrey became increasingly

11  hostile toward the petitioner.  Petitioner avoided crossing path

12  with Aubrey.

13     Petitioner heard from his cousin  who had heard from Aubrey's

14  ex-girfriend that Aubrey said he was going to kill the petitioner.

15  (RT. 583-584).  Knowing Aubrey was a person capable of anything,

16  including murder, as his record would attest, petitioner became

17  extremely concerned for his safety. (RT. 450)

18     On that day, petitioner was standing near the corner of Bromley

19  Street.  Aubrey drove by, saw petitioner, pulled around the corner

20  and parked.  Appearing quite upset, he approached petitioner. (RT.

21  451)  Aubrey mouthed something indiscernable. (RT 439).  When Aubrey

22  was about 10 feet of petitioner he reached toward his waist.

23  Thinking Aubrey was reaching for a gun petitioner went for his and

24  shot Aubrey. (RT 451-452).  Aubrey looked as if still reaching for

25  his waist and fearing he might still be able to retrieve his weapon,

26  petitioner continued shooting. (RT 453).  Petitioner shot Aubrey

27  9 times. (RT 395-396)

28

1

2    A knife was recovered from inside Aubrey's pocket. (RT. 526-536)

3    Petitioner fled to Utah. He found a job there. However, after

4 3 months he decided to turn himself in. He called a bail bondsman

5 to arrange for a surrender. (RT. 580) Through the bail bondsman

6 the petitioner spoke to a Sgt. Sherman. Petitioner wanted to return

7 to Oakland and surrender directly to the Oakland police. Petitioner

8 asked for a few more days to get his affairs in order.

9    Presumably because petitioner did not conceal his location nor

10 identity, he was arrested by the Utah authority on behalf of Oakland

11 police. (RT 581). While in custody, petitioner cooperated. He

12 spoke candidly to the investigators. The only exception was that

13 he did not reveal where he hid the gun, believing that without the

14 gun the prosecution's case would be weaker. (RT. 440).

15    As to all other allegations, unless specifically admitted,

16 petitioner denies each and every allegations and contentions stated

17 in the OPPOSITION.

18    Petitioner realleges and incorporates by reference herein all

19 the allegations and contentions set forth in the petition.

20

21 ///

22

23

24

25

26

27

28

1

2                              ARGUMENT I

3        Respondent argued that a claim based on <u>Apprendi v. New Jersey</u>,

4   530 U.S. 466, 120 S.Ct. 2348, (2000)(Apprendi), made now is untimely;

5   that Apprendi is inapplicable to petitioner's case; and that the

6   decision in <u>Cunningham v. California</u>, 127 S.Ct. 856, (2007)(Cunning-

7   ham), announced a new rule that cannot be retroactively applied.

8

9     A. THE APPRENDI CLAIM IS TIMELY RAISED AND THE HOLDING IN
         APPRENDI IS SUFFICIENTLY CLEAR TO PROVIDE THE BASIS UPON
10       WHICH RELIEF MAY BE GRANTED.

11       At the time Apprendi was decided, petitioner's direct appeal

12  was in its final stage.  The California Supreme Court had already

13  issued its decision denying review.  Had it not been the 90 days in

14  which a certiorari petition may be sought, his Apprendi claim would

15  have been time barred. <u>Caspari v. Bohlen</u>, 510 U.S. 383, 390, (1994).

16  Appellate counsel had, by then, disengaged himself from petitioner's

17  case.  And petitioner himself was not sophisticated enough to

18  decipher the legal complexities of the Apprendi ruling and how it

19  might affect petitioner.[1/]  It was only until Cunningham, which

20  spelled out unequivacally how upper term sentences, imposed without

21  the factual basis being tried to the jury, violate the Sixth Amend-

22  ment to the Constitution, did the claim became known to the

23  petitioner.

24       Moreover, a habeas petition raising Apprendi claim would have

25  been denied before the advent of Cunningham.  The timeliness bar

26  does not require a petitioner to present a claim that would have

27  ─────────────────────────────────────────
    1. The petitioner still does not possess the legal acumen to compre-
28     hend the forces that drive Apprendi and its progeny.  He relies
       on jailhouse lawyers like most all prisoners.

1

2    been denied in order to preserve it.

3        In addition, the validity of a sentence may be challenged at

4    any time. In Re Estrada, (1965) 63 Cal.2d 740, 750, 48 Cal.Rptr 172,

5    In fact, an Apprendi claim is essentially a claim that the sentencing

6    court acted in excess of its jurisdiction and "the rule requiring a

7    habeas corpus petitioner to justify any substantial delay in raising

8    a claim, however, is inapplicable to a claim, as here, of sentencing

9    error amounting to an excess of jurisdiction." In Re Harris, (1993)

10   5 Cal.4th 813, 842, 21 Cal.Rptr.2d 373, 389.

11       Respondent says petitioner's "sentence is permitted by law and

12   would certainly be reimposed even if he were successful here.   The

13   conclusion that the sentence was not an abuse of discretion has

14   been [reached by every state and federal courts.]" (OPPOSITION,

15   p. 10)   Petitioner is not arguing the correctness of the upper terms

16   he received nor whether it was an abuse of discretion to impose

17   them, but the authority of the sentencing court to impose those

18   upper terms.   This is what Apprendi holds: "Other than the fact of

19   a prior conviction, any fact that increases the penalty for a crime

20   beyond the prescribed statutory maximum must be submitted to a jury,

21   and proved beyond a reasonable doubt." Apprendi, supra, 530 U.S. at

22   490.   Petitioner's sentence is in direct contravention to this

23   holding.   Petitioner's sentence is therefore, not permitted by law.

24       Respondent asserts that petitioner's case does not fall within

25    the exception to the untimeliness bar.   Respondent cites In Re

26   Clark, (1993) 5 Cal.4th 750, and In Re Robbins, (1998) 18 Cal.4th

27   770.   These are death penalty cases that come within the purview of

28   the Supreme Court Policies Regarding Cases Arising From Judgments

COURT PAPER
TATE OF CALIFORNIA
TO. 113 (REV. 8-72)

I5 34769

5

1

2   Of Death and for that reason singled out for special considerations.
3   The exceptions, enumerated by the respondent, is likewise for the
4   purpose of assessing claims against the backdrop of death penalty.
5   Indeed, the Supreme Court prefaced these exceptions with the follow-
6   ing statement: "The magnitude and gravity of the penalty of death
7   persuades us that the important values which justify limits on
8   untimely and successive petitions..." (Clark, at p. 797.)   In non-
9   capital cases, a habeas petitioner has to explain and justify any
10  unreasonable delay but not necessarily in these terms.

11       Respondent suggests that because petitioner's assertion that
12  he did not realize he has an Apprendi claim until Cunningham means
13  the petitioner concedes that, rather than an Apprendi claim,
14  petitioner has a Cunningham or Blakely claim. (OPPOSITION, p.9)
15  No such concession is intended.   It is petitioner's position that
16  Cunningham and Blakely are both restatements of Apprendi.   They
17  came to bring astrayed understandings of Apprendi in line with its
18  original holding.   On this point petitioner will discuss more fully
19  below.

20       Respondent also quoted People v. Sengpadychith, (2001) 26 Cal.
21  4th 316, 326, as support for her position that Apprendi holding is
22  controlling only to the extent a sentence enhancement provision is
23  called upon to increase a sentence. (OPPOSITION, p. 10)   The quota-
24  tion is taken out of context and misleading.   Sengpadychith deals
25  with "the gang statute's enhancement sentence provision and what
26  needs to be proved before it can be applied.   The court there simply
27  applied the principle enunciated in Apprendi and paraphrased it to
28  suit that occasion.

1

2    Petitioner wonders if respondent's arguments regarding the

3  timeliness of petitioner's Apprendi claim and whether Blakely and

4  Cunningham may be retroactively applied would be rendered moot if

5  petitioner's central premise-that Blakely and Cunningham decisions

6  were dictated by Apprendi-is validated by this Court.  This is

7  perhaps the most pertinent issue before this Court.  Petitioner

8  believes it must be so.

9    Although respondent's reliance on the "reasonable jurists

10 disagreeing" makes a compelling argument , it must fail here

11 because every essential holding in Blakely and Cunningham traces its

12 root to Apprendi.  Reading Apprendi fairly and objectively, it is

13 inevitable that the conclusions of Blakely and Cunningham be reached.

14 This is evident from both comparing the decisions together or

15 analyze the holding of Apprendi by itself.

16    In Cunningham, the Supreme Court reiterated that all of its

17 holding have always been based on Apprendi: "We have since reaffirm-

18 ed the rule of Apprendi, applying it to facts subjecting a defendant

19 to the death penalty, Ring v. Arizona [citation], facts permitting

20 a sentence in excess of the 'standard range' under Washington's

21 sentencing Reform Act, Blakely [citation], and facts triggering a

22 sentence range elevation under the then-mandatory Federal Sentencing

23 Guidelines, Booker [citation]." Cunningham, at p. 864.  In Blakely,

24 after setting forth the facts in the case, the very first expression

25 was "this case requires us to apply the rule we expressed in

26 Apprendi..."  Indeed, the succeeding decisions did not come to add

27 new content, but to reinforce Apprendi's consistency.

28    Respondent suggests that Apprendi alone would not afford relief

COURT PAPER
TATE OF CALIFORNIA
TO. 113 (REV. 8-72)

5 34769

7

1
2  to petitioner.  "Apprendi addressed whether an uncharged and unprov-
3  en hate-crime enhancement could be applied to impose a sentence
4  that exceeded the sentencing range for the crime. [citation]
5  Petitioner, whose personal gun-use enhancement was charged and
6  found true by a jury beyond a reasonable doubt does not have an
7  Apprendi claim." (OPPOSITION, p.9, fn.1)

8      One of the key concern of Apprendi was to make sure there is
9  no uncertainty about what was offensive to the right of trial by
10  jury.  "[I]t is unconstitutional for a legislature to remove from
11  the jury the assessment of facts that increase the prescribed range
12  of penalties to which a criminal defendant is exposed.  It is equally
13  clear that such facts must be established by proof beyond a reason-
14  able doubt." (Apprendi at p. 490.) California's sentencing scheme
15  which required a judge to find a qualifying fact before the upper
16  term can be imposed, is exactly the kind of legislative act prohib-
17  ited here.  This principle cannot be limited by how the qualifying
18  fact is labeled, or as respondent would have it, how it is packaged.
19  "Despite what appears to us the clear'elemental' nature of the
20  factor here, the relevant inquiry is one not of form, but of effect-
21  does the required finding expose the defendant to a greater punish-
22  ment than that authorized by the jury's guilty verdict?" (Apprendi,
23  at p. 494)

24      The New Jersey statute was invalidated not because a fact that
25  increases punishment was labeled a particular way,but rather because
26  a fact used by the court to bump up the sentence was found by the
27  judge.  And that is what Apprendi proscribes.

28

1

2      The Second Appellate District recently decided <u>In Re Gomez</u>,

3  B197980, 2007 DJDAR 12060.  Among others it more or less holds that

4  since appellate courts held differing view about Blakely before

5  the question was settled by the Supreme Court in <u>People v. Black</u>,

6  (2005) 35 Cal.4th 1238 (Black I), it necessarily means that the

7  rule set forth in Cunningham then was not apparent to all reasonable

8  jurists.  On that score the court held Cunningham was not dictated

9  by Blakely.  This view was also argued by the respondent.  However,

10  that cannot be the sole determinant.  For almost every Supreme

11  Court ruling was preceded by courts disagreeing over antecedent

12  rulings.  If the mere presence of courts disagreeing is sufficient

13  every High Court's decision would be announcing a new rule.  The

14  test of whether a constitutional rule is new must be evaluated by

15  ascertain the legal landscape as it then existed and ask whether

16  the constitution, as interpreted by the precedent then existing,

17  compels the rule. <u>Beard v. Banks</u>, (2004) 542 U.S. 410, 411.  As

18  discussed, the Apprendi rule is unequivocal and its application

19  straight forward.  Petitioner is therefore entitled to relief

20  under it.

21

22

23

24

25

26

27

28

1

2                          ARGUMENT II

3              THE SIXTH AMENDMENT VIOLATION IS NOT HARMLESS

4        Two upper terms were imposed in petitioner's case.  One based

5   in part on petitioner's prior felony conviction and his status as

6   a probationer.  The second upper term was based entirely on his

7   conduct relating to the commission of the offense. (see PETITION,

8   p.3-4; OPPOSITION, p.22)  In light of the recent Supreme Court

9   decision in People v. Black, S126182, 7/19/07, and recognizing that

10  this COurt is bound by the holding, petitioner will at this time

11  limit his argument to only the latter of the two upper terms.  Even

12  though set aside for now, petitioner would like to preserve his

13  challenge to the first upper term when more favorable climate come

14  to pass.

15       In evaluating the gun-use upper term, the Court should take

16  guidance from the other recent Supreme Court decision, People v.

17  Sandoval, S148917, also decided on 7/19/07.  "In a case such as the

18  present one, the reviewing court cannot necessarily assume that

19  the record reflects all of the evidence that would have been presented

20  had aggravating circumstances been submitted to the jury.  Although

21  the aggravating circumstances found by the trial court were based

22  upon the evidence presented at trial, they were not part of the

23  charge and were not...Defendant thus did not necessarily have reason

24  -or the opportunity-during trial to challenge the evidence supporting

25  these aggravating circumstances...[¶]...Accordingly, a reviewing

26  court cannot always be confident that the factual record would have

27  been the same had aggravating circumstances been charged and tried

28  to the jury."

COURT PAPER
TATE OF CALIFORNIA
TO. 113 (REV. 8-72)

l5 34769

10

1

2    Just as the Supreme Court determined that the finding that the

3 crime in Sandoval involved great violence cannot be seriously chall-

4 enged, petitioner does not dispute the number of shots petitioner

5 fired.   However, petitioner does dispute whether that fact amounted

6 to egregious use of the firearm.   The jury, had the question been

7 submitted to them, might reasonably have concluded that under the

8 circumstances and in light of petitioner's fear that Aubrey might

9 still be able to return fire, extenuated petitioner's culpability.

10    As to the other findings by the court-that petitioner had not

11 disclosed the location of the gun and the court's doubt regarding

12 petitioner's remorse-were "not factors listed in the sentencing

13 rules and it is not clear how [these aggravating circumstances]

14 would have been defined for the jury had it been submitted to them

15 ...] it is impossible for this court to conclude beyond a reasonable

16 doubt that the jury would have found [the facts to be true]."

17    Finally, it must be considered that the petitioner was not

18 given notice of the allegations supporting the upper term.   Due

19 process requires that notice be given the accused so that he may

20 have an opportunity to defend against it.

21    For the foregoing reasons petitioner's sentence must be

22 vacated and the middle term be imposed in its stead.

23

24                                    Respectfully submitted,

25

26 DATE: August 26, 2007

27

28

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare the following:

I am over 18 years of age, and a party to the within action.

My address is: Ladell Dickerson, P-48453
P.O. Box 3461
Corcoran, CA 93212

On Aug 28, 2007, I served a copy of the attached

REPLY TO RESPONDENT'S OPPOSITION

On the below-named persons by placing a true copy thereof in envelope addressed as follows, with first class postage thereon fully prepaid, and delivering the sealed envelopes, according to the procedures prescribed for sending legal mail, to the proper institutional official for deposit in the United States mail at Corcoran, in the County of Kings, California.

Court of Appeal of Calif
350 McAllister St.
San Francisco, CA 94102

Executed under penalty of perjury this 28th day of August, 200 7, at Corcoran, California.

_____

DECLARANT

# EXHIBIT

# F

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1



In re LADELL DICKERSON on Habeas Corpus.

A117975
Alameda County No. 131928

**FILED**
COURT OF APPEAL FIRST APPELLATE DISTRICT

**SEP 04 2007**

DIANA HERBERT, CLERK
BY_____ DEPUTY CLERK

BY THE COURT:

The petition for writ of habeas corpus is denied.

The justices participating in this matter were:

Acting Presiding Justice Stein, Justice Swager and Justice Margulies

Date: SEP - 4 2007 _____

**STEIN, J.** ACTING P.J.
_____

orcc1a

# EXHIBIT G

S156711

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re LADELL DICKERSON on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAR 1 9 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

Mr. LAdell DickeRSoN P. 48463
C.S.P. CoRcoRAN, 3A01-244u
P.O. Box 3461
CoRcoRAN, CA. 93212

PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ®
www.usps.com

Label 107B, February 2006

RECEIVED

MAY 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES
CouRt. NoRtheRN DistR
CaliforNia.
450 GoldeN GAt
SAN FraNcisco, C